**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| UBS FINANCIAL SERVICES INC., and ANDREW BURISH, <br><br> Petitioners, <br><br> v. <br><br> DENNIS HANSEN, LESLIE HANSEN, TYLER HANSEN, NOELLE HANSEN, BRADLEY NELSON, JORDAN NELSON, LINDSEY VALENTINI, NICHOLAS VALENTINI, and MARK KRAMER, <br><br> Respondents. | Civil Action No. _4:25-cv-120_ <br><br> **Oral Argument Requested** |

**Memorandum of Law in Support of Petitioners' Motion to Vacate Arbitration Award**

**Table Of Contents**

Introduction ........................................................................................................................ 1

Background ........................................................................................................................ 2

    I.     Factual background ........................................................................................ 2

    II.    Procedural background .................................................................................. 5

    III.   The arbitration award .................................................................................... 6

Standard Of Review ........................................................................................................... 7

Argument .......................................................................................................................... 7

    I.     The award against UBS exceeds the panel's authority and violates well-
         defined public policy because it is impermissibly excessive ................................ 7

         A.     The limits on excessive punitive awards apply in arbitration .................... 8

         B.     The nearly $70 million punitive award imposed on UBS is
              impermissibly excessive and therefore contrary to public policy ............ 11

    II.    The award against UBS and Burish exceeds the panel's authority and
         violates well-defined public policy because it does not satisfy the
         threshold requirements of Iowa Code § 668A.1. ................................................ 17

         A.     Iowa law requires a factfinder to make two threshold
              determinations before awarding 100% of a punitive damages
              award to claimants. ............................................................................... 17

         B.     The panel failed to make either of the threshold determinations
              required by Iowa law. ........................................................................... 18

Conclusion ...................................................................................................................... 20

# Table Of Authorities

**Cases**

*Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*,
    344 F.3d 738 (8th Cir. 2003) ...................................................................................15

*Beumer Corp. v. ProEnergy Servs., LLC*,
    899 F.3d 564 (8th Cir. 2018) ...................................................................................10

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996).....................................................................1, 9, 11, 12, 13

*Boerner v. Brown & Williamson Tobacco Co.*,
    394 F.3d 594 (8th Cir. 2005) .......................................................................2, 13, 14

*Bowen v. Amoco Pipeline Co.*,
    254 F.3d 925 (10th Cir. 2001) ..................................................................................10

*Brown v. Brown-Thill*,
    762 F.3d 814 (8th Cir. 2014) ....................................................................1, 18, 19

*Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*,
    381 F.3d 811 (8th Cir. 2004) ...................................................................................14

*Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    906 F.2d 1206 (8th Cir. 1990) .................................................................................15

*Davis v. Prudential Sec., Inc.*,
    59 F.3d 1186 (11th Cir. 1995) .................................................................................10

*Eden Elec., Ltd. v. Amana Co.*,
    370 F.3d 824 (8th Cir. 2004) .............................................................................14, 15

*Entergy Operations, Inc. v. United Gov't Security Officers of Am. Int'l Union*,
    856 F.3d 561 (8th Cir. 2017) .....................................................................................7

*Ezzone v. Riccardi*,
    525 N.W.2d 388 (Iowa 1994) .....................................................................................9

*Fell v. Kewanee Farm Equipment Co.*
    457 N.W.2d 911 (Iowa 1990) .....................................................................................7

*Gibson v. ITT Hartford Ins. Co.*,
    621 N.W.2d 388 (Iowa 2001) ...................................................................................18

*Hall Street Assoc's, LLC v. Mattel, Inc.*,
    552 U.S. 576 (2008).....................................................................................................10

*Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*,
    758 F.3d 1051 (8th Cir. 2014) .............................................................................11, 14,

*Harlan Feeders, Inc. v. Grand Lab'ys, Inc.*,
  881 F. Supp. 1400 (N.D. Iowa 1995)................................................................18

*Industrial Steel Constr., Inc. v. Lunda Constr. Co.*,
  33 F.4th 1038 (8th Cir. 2022) .........................................................................7

*JCB, Inc. v. Union Planters Bank, NA*,
  539 F.3d 862 (8th Cir. 2008) ..........................................................................15

*Lakin v. Richards Farm Ltd.*,
  862 N.W.2d 414 (Iowa Ct. App. 2015)..............................................................15

*McGough v. Gabus*,
  526 N.W.2d 328 (Iowa 1995) ..........................................................................7

*Ondrisek v. Hoffman*,
  698 F.3d 1020 (8th Cir. 2012) .........................................................................14

*PaineWebber, Inc. v. Agron*,
  49 F.3d 347 (8th Cir. 1995) .................................................................1, 7, 10

*Philip Morris USA v. Williams*,
  549 U.S. 346 (2007)...............................................................................1, 11

*Sanders v. Gardner*,
  7 F. Supp. 2d 151 (E.D.N.Y. 1998) ..................................................................10

*Sawtelle v. Waddell & Reed*,
  304 A.D.2d 103 (N.Y. App. Div. 2003) ..............................................................10

*Schwickerath v. Anderson*,
  990 N.W.2d 682 (Iowa Ct. App. 2022)..............................................................15

*Shepherd Components, Inc. v. Brice Petrides-Donohue & Assocs.*,
  473 N.W.2d 612 (Iowa 1991) ..........................................................................17

*Spaur v. Owens-Corning Fiberglas Corp.*,
  510 N.W.2d 854 (Iowa 1994) ..............................................................8, 18, 19

*Stark v. Sandberg, Phoenix & von Gontard, P.C.*,
  381 F.3d 793 (8th Cir. 2004) ..........................................................................10

*State Farm Mutual Auto Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)...........................................................1, 8, 9, 11, 12, 13, 14

*Thornton v. Am. Interstate Ins. Co.*,
  940 N.W.2d 1 (Iowa 2020) ..............................................................................1

*Varboncouer v. State Farm Fire and Cas. Co.*,
  356 F. Supp. 2d 935 (S.D. Iowa 2005) ..............................................................19

*Watkins v. Lundell*,
  169 F.3d 540 (8th Cir. 1999) ..................................................................9, 10, 15

*Williams v. ConAgra Poultry Co.*,
　　378 F.3d 790 (8th Cir. 2004) ................................................................11, 12, 13, 14

*Wilson v. IBP, Inc.*,
　　558 N.W.2d 132 (Iowa 1996) ..............................................................................15

**Statutes**

9 U.S.C. § 10 .................................................................................2, 7, 10, 17, 20

9 U.S.C. § 11 ...........................................................................................................20

ICA § 668A.1 ........................................................................................2, 7, 8, 17, 18

ICA § 714.9 .............................................................................................................16

ICA § 902.9 .............................................................................................................16

**Other Authorities**

*Hagman v. Citigroup Global Markets, Inc.*, FINRA ID No. 09-03251 (Oct. 6,
　　2010), https://tinyurl.com/2nz9e3y8 ....................................................................16

*Hosier v. Citigroup Global Markets, Inc.*, FINRA ID No. 09-03297 (Apr. 11,
　　2011), https://tinyurl.com/3ubnd2zu ...................................................................16

*Jannetti v. Stifel, Nicolaus & Co.*, FINRA ID No. 23-01342 (Mar. 12, 2025),
　　https://tinyurl.com/mvt938ya ..............................................................................16

*Robinson v. Oppenheimer & Co., Inc*, FINRA ID No. 21-02234 (Sept. 6, 2022),
　　https://tinyurl.com/4538th9c ...............................................................................16

*SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures*,
　　SEC.gov (Sep. 27, 2022), https://tinyurl.com/4nyxbdhn ......................................4

FINRA Rule 12200 ...................................................................................................5

FINRA Rule 12904 ...........................................................................................5, 8, 19

**Introduction**

An arbitration panel ordered UBS Financial Services Inc. and a UBS financial advisor, Andrew Burish, to pay more than $90 million—including nearly $70 million in punitive damages—based on allegedly unsuitable investment advice that caused a group of wealthy investors to lose money. The standard for vacating an arbitral award under the Federal Arbitration Act (FAA) is a high bar. But this is an exceptional case. Controlling precedent authorizes courts to vacate awards where, as here, the award is inconsistent with clear public policy and exceeds the boundaries of applicable law. *Brown v. Brown-Thill*, 762 F.3d 814, 824–25 (8th Cir. 2014); *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995). For two reasons, the Court should vacate the award.

*1.* The nearly $70 million award against UBS is grossly excessive and therefore violates well-established federal and Iowa public policy. Punitive damages are inherently policy-based, so constitutionally excessive and irrational punitive awards necessarily violate public policy. Accordingly, the Supreme Court has repeatedly warned of the dangers of excessive awards. *See, e.g.*, *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *see also Thornton v. Am. Interstate Ins. Co.*, 940 N.W.2d 1, 19–32 (Iowa 2020) (describing Iowa and federal law). Here, the award is many times higher than any punitive award that the Eighth Circuit or Iowa Supreme Court has upheld under *State Farm* and *Gore*.

The recipients of the award ("Claimants") claimed that such a massive amount was justified because UBS supposedly failed to learn its lesson from a 2022 settlement with the Securities and Exchange Commission relating to alleged companywide recordkeeping violations concerning text messages. That is plainly an impermissible basis to award massive punitive damages to a single group of individuals challenging a single financial advisor's investment advice. *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007) (punitive damages must relate to harm suffered by

1

plaintiffs).  In a highly regulated area like the securities industry, premising a massive, state law punitive award on regulatory violations that a federal agency *has already addressed* is even less proper.  On these facts, where Claimants' harm was exclusively financial, the maximum lawful amount would have been approximately $23 million—a 1:1 ratio to Claimants' compensatory damages.  *See Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (reducing $15 million award to $5 million for "ratio of approximately 1:1" to compensatory damages).

*2.*  The grossly excessive award was the result of the panel's haphazard approach to punitive damages.  Iowa law, cited by the panel as providing authority for the award, in fact requires a punitive award to be premised on specific factual findings that determine: (1) whether the award is permissible at all; and (2) whether 75% (or more) of the award goes to a civil reparations trust fund.  ICA § 668A.1.  The panel failed to make either finding here, and in doing so necessarily failed even to decide whether Claimants' recovery under Iowa law was limited to 25% (or less) of the total.  For that reason, too, the award violates clear public policy and exceeded the arbitrators' power.  Indeed, the panel's failure to determine an appropriate allocation of the award under Iowa law or consider Iowa's clear public policy concerning the allocation of punitive damages confirms that the panel's deliberations were fatally flawed, rendering the entire award invalid.  *See* 9 U.S.C. § 10(a)(4).

For both reasons, the Court should vacate the award.

## Background

## I.    Factual background

Many of Claimants' assertions during the arbitration were dubious, unsupported, or outright false.  But because the arbitrators may have credited Claimants' story, and because this motion

does not turn on any disagreement about the underlying evidentiary record, UBS and Burish describe the facts below as they were presented by Claimants themselves.[1]

Claimants each had investment accounts with UBS, and Burish was their UBS financial advisor. Ex. A ¶ 18 (Statement of Claims). Claimants are independently wealthy individuals, Ex. B 2 (Claimants' Post-hearing Br.), but they consider themselves "retail investors" with "no background" in finance. Ex. C 43:11-44:6. According to Claimants, beginning in 2017, Burish began advising them to short-sell Tesla stock—i.e., to borrow the stock and sell it at market prices, with the hope of buying it back later at a lower price to return it to the lender. Ex. A ¶¶ 20–21. Short-selling is a high-risk, high-reward strategy that can lead to heavy losses when a stock's price goes up. In 2020, Tesla stock rose quickly, causing Claimants to incur millions in losses. Claimants ultimately closed their positions by the end of July 2020, realizing collective losses of approximately $23 million, *id.* ¶¶ 33, 38, 42, 46, 52, 55.

Throughout this period, Burish was allegedly calling and texting Claimants, promoting a one-sided view that Tesla stock was overvalued, and urging Claimants to maintain their short positions despite mounting losses. *E.g.*, Ex. A ¶¶ 23, 54 (Statement of Claims). Claimants further allege that Burish falsely led them to believe he was maintaining his own Tesla short positions, inducing them to do the same even though he had closed out his positions. Ex. B 34–37 (Claimants' Post-hearing Br.). Burish also deleted text messages to Claimants from his phone—which Claimants say was intentional—"deliberately" causing Burish and UBS to maintain an "incomplete and misleading" record of Burish's unsuitable investment advice. Ex. D 28:19-25, 37:13-38:25 (Hearing Tr.). Claimants further allege that UBS failed to supervise Burish or protect them

---

[1] For the same reason, and to avoid burdening the Court with a lengthy evidentiary record, this brief primarily relies on and cites Claimants' own version of events as alleged and argued in their initial filings, pre- and post-trial briefs, and opening and closing arguments.

from incurring losses, even after other UBS employees saw warning signs that Claimants were invested in an unsuitable short-selling strategy. Ex. B 2.

In addition to the allegations concerning Burish's conduct (and UBS's alleged failure to supervise him), Claimants relied heavily on a settlement that UBS entered with the Securities and Exchange Commission in September 2022. Ex. E (SEC Settlement). There, UBS admitted to violating the Exchange Act by failing to retain personal text messages sent by UBS employees or similar "off-channel communications." Ex. E 1–2. The "failure was firm-wide, and involved employees at all levels of authority." *Id.* UBS further admitted to violating Section 15(b)(4) of the Exchange Act by failing to reasonably supervise its employees, including by "fail[ing] to implement its policies and procedures that prohibit such communications." *Id.* at 2, 6. As part of the settlement, UBS agreed to notify the SEC of "any discipline imposed by UBS . . . with respect to any employee found to have violated UBS's policies and procedures concerning the preservation of electronic communications." *Id.* at 9. UBS also agreed to pay a civil penalty of $125 million. *Id.* at 10.[2]

According to Claimants, the recordkeeping violations underlying UBS's settlement with the SEC were relevant to their claims against UBS and Burish in at least three ways. *First*, because the violations that UBS settled with the SEC occurred during the same time period as Burish's alleged misconduct, Claimants say the settlement proves that Burish's use of text messaging and destruction of those messages was illegal and violated UBS's policies. Ex. H 130:5–11 (Hearing Tr.). *Second*, Claimants say that by failing to prevent Burish from sending them investment advice

---

[2] UBS's conduct was not unique within the financial services industry; the SEC entered similar settlements concerning off-channel communications with 15 of UBS's peers, imposing total fines of more than $1.1 billion. *See SEC Charges 16 Wall Street Firms with Widespread Recordkeeping Failures*, SEC.gov (Sep. 27, 2022), https://tinyurl.com/4nyxbdhn.

via text messages (and then deleting the messages), UBS allowed Burish to avoid monitoring of his communications. *Id.* at 89:22–90:3, 126:9–22. According to Claimants, such monitoring is necessary to ensure that financial advisors give investors suitable advice. *Id.* *Third*, Claimants say that UBS's failure to punish Burish after learning about his text messaging, along with UBS's defense of Burish's text messaging during the arbitration, demonstrates that UBS breached its obligations to the SEC and had "not gotten the message" from the SEC settlement. Ex. D 37:4–38:25.

## II.    Procedural background

Firms such as UBS and financial advisors such as Burish are required to arbitrate customer disputes before FINRA arbitration panels (at the customers' election). Ex. I ("FINRA Rules"), at FINRA Rule 12200. In addition, UBS and Claimants had separate agreements requiring them to arbitrate their disputes. *E.g.*, Ex. J at UBS_008250. The parties' agreements provided that the arbitration would "be governed by the rules of the organization convening the panel" and that "[t]he arbitrators shall resolve any controversy in accordance with applicable law." *Id.*; *see also* FINRA Rule 12904(a) ("All awards shall be in writing and signed by a majority of the arbitrators or *as required by applicable law*.") (emphasis added); FINRA Rule 12904(b) ("*Unless the applicable law directs otherwise*, all awards rendered under the Code are final and not subject to review or appeal.") (emphasis added).

As relevant here, FINRA's rules generally do not require arbitrators to enter a reasoned decision unless the parties "jointly request" one. FINRA Rule 12904(g)(1). For punitive damages, however, FINRA's "Arbitrator's Guide" provides that "[i]f punitive damages are awarded," "arbitrators should include in the award the basis for awarding punitive damages." Ex. K 69 (Arbitrator's Guide). The Guide further provides that "[t]he standards for awarding punitive damages vary from state to state." *Id.*

In 2022, Claimants initiated arbitration against UBS and Burish, bringing four claims alleging: (1) breach of fiduciary duty; (2) "violation of FINRA suitability rules" governing investment advice; (3) negligent supervision; and (4) fraud.  Ex. A ¶¶ 64–97 (Statement of Claims).

After a trial, the parties submitted closing arguments and post-trial briefs outlining their respective positions on punitive damages.  UBS maintained that no punitive damages were warranted because Claimants failed to satisfy the standard for moral culpability, failed to show the requisite harm to the public, and could not show sufficient wrongdoing in UBS's supervision of Burish.  Ex. L 47–48 (UBS Post-hearing Br.).

Claimants sought compensatory damages of up to $36 million and punitive damages of up to four times that amount "to deter future violations."  Ex. B 2, 41–47 (Claimants' Post-hearing Br.).  They argued that punitive damages were warranted given Burish's "deliberate" deletion of "hundreds of text messages with price and performance predictions," and UBS's failure to prevent Burish from doing so.  *Id.* at 4–5.  Claimants gave particular attention to UBS's settlement with the SEC, *supra* at 4–5.  They insisted, for example, that the SEC's $125 million fine "was apparently insufficient deterrence" to prevent further misconduct, Ex. B at 42—even though Burish's purported violations occurred prior to the SEC settlement, and during the same time period for which the SEC had already punished UBS.  Claimants further argued that punitive damages would penalize UBS's and Mr. Burish's "'concede nothing' strategy" during the arbitration itself.  *Id.* at 42–46.

## III.    The arbitration award

On February 27, 2025, the arbitration panel found UBS liable for compensatory damages of $23,059,521.90 and Burish liable for compensatory damages of $2,562,169.10.  Ex. M ("Award") 3–4.  The panel also awarded Claimants nearly $70 million in punitive damages from both UBS and Burish, broken down into specific awards to the individual Claimants.  *Id.*  UBS

was ordered to pay the vast majority of the punitive award—$69,178,565.70—and Burish was

ordered to pay an additional $500,000.  *Id.*  The panel failed to provide any explanation of the basis

for the punitive award or its total size.  Instead, the panel simply recited the amount of the punitive

award for each Claimant and stated that the award was "pursuant to Iowa Civil Jury Instructions

June 2024 210.1; Iowa Code Sec. 668A.1; *McGough v. Gabus*, 526 N.W.2d 328, 334 (Iowa 1995)

(quoting *Fell v. Kewanee Farm Equipment Co.* 457 N.W.2d 911, 919 (Iowa 1990))."  *Id.* (non-

substantive citation errors corrected).

## Standard Of Review

As relevant here, the FAA requires courts to vacate an arbitration award "where the arbi-

trators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite

award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  The standard under

the FAA is deferential—"[a]n arbitrator does not exceed his powers by making an error of law or

fact, even a serious one."  *Industrial Steel Constr., Inc. v. Lunda Constr. Co.*, 33 F.4th 1038, 1041

(8th Cir. 2022) (quotations omitted).  At the same time, this Court's review is not toothless.  Courts

must overturn an award that "is contrary to a 'well-defined and dominant' policy embodied in laws

and judicial precedent."  *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995); *see also*

*Entergy Operations, Inc. v. United Gov't Security Officers of Am. Int'l Union*, 856 F.3d 561, 564

(8th Cir. 2017) (same).  A court reviews an arbitrator's legal conclusions "de novo to determine

whether the award violates public policy."  *Entergy*, 856 F.3d at 564.

## Argument

## I.    The award against UBS exceeds the panel's authority and violates well-defined public policy because it is impermissibly excessive.

The panel's award vastly exceeds the outer limits of permissible punitive damages under

both federal and Iowa law.  "[P]unitive damages pose an acute danger of arbitrary deprivation of

property," especially "when the decisionmaker is presented . . . with evidence that has little bearing as to the amount of punitive damages that should be awarded." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418–19 (2003) (quotations and alteration omitted).  Here, $70 million is grossly excessive and patently unlawful under federal and Iowa precedent.  Accordingly, the award exceeds the scope of the panel's power and is contrary to well-established public policy.

### A.    The limits on excessive punitive awards apply in arbitration.

When it comes to punitive damages, the arbitration in this case did not occur in a law-free zone, where anything goes.  For starters, FINRA's rules incorporated "applicable law" into the rules governing the panel's award.  FINRA Rule 12904(a), (b); *supra* at 5.  The agreements be-tween Claimants and UBS similarly provide that "[t]he arbitrators shall resolve any controversy in accordance with applicable law."  *E.g.*, Ex. J at UBS_008250.  The panel specifically cited Iowa law as providing authority to make the punitive damages awards here, so the policies, standards, and limits applicable in Iowa to punitive awards necessarily constrained the arbitrators' power to award punitive damages under the terms of the parties' agreement.

Excessive awards are also inconsistent with well-established public policy under both fed-eral and Iowa law.  Punitive damages are inherently policy-based—"they are aimed at deterrence and retribution" on behalf of the public, and are not meant to be merely extra compensation for a plaintiff's loss.  *State Farm*, 538 U.S. at 416–17; *see also Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 865 (Iowa 1994) (similar under Iowa law).  Iowa statutory law reflects that same principle, providing that a factfinder must make specific factual findings to determine whether 75% of a punitive award goes to "a civil reparations trust fund," ICA § 668A.1(2)(b), so that some of the funds from punitive awards can be used for "a public purpose," *Spaur*, 510 N.W.2d at 869.  But "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and

constitutes an arbitrary deprivation of property," depriving defendants of "fair notice . . . of the penalty that a State may impose." *State Farm*, 538 U.S. at 417 (quotations omitted).

Excessive punitive awards also interfere with "state sovereignty and comity" where, as here, they are used to punish a "nationwide policy" under the laws of a single State. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm*, 538 U.S. at 422. Punitive awards based in part on out-of-state conduct violate this "basic principle of federalism," *id.*, by allowing one State to "impose its own policy choice on neighboring States," *Gore*, 517 U.S. at 571.

Accordingly, the Due Process Clause imposes substantive limits on a State's power to impose penalties on a defendant through punitive damages—States "do[] not have the power" to order punishment in a manner that exceeds their authority under the Constitution or state and federal law. *Gore*, 517 U.S. at 572–73 & n.17; *see also State Farm*, 538 U.S. at 417. These limits apply regardless of how the punitive damages are imposed. *See Gore*, 517 U.S. 559 at 572–73 & n.17 (comparing punitive damages to "legislatively authorized fines" and explaining that they are an exercise of "State power" even when they are imposed by juries rather than legislators).

Courts play a vital role in policing these lines. "Procedural and substantive strictures are necessary to ensure that punitive damage awards, which are proxy for punishment and deterrence, comply with constitutional requirements." *See Watkins v. Lundell*, 169 F.3d 540, 545 (8th Cir. 1999); *see also Ezzone v. Riccardi*, 525 N.W.2d 388, 398–99 (Iowa 1994) (recognizing the need for appellate review of punitive awards). In *Watkins*, the Eighth Circuit applied this principle in holding that "an award of excessive and unconstitutional punitive damages in and of itself presents

exceptional circumstances" warranting relief from a default judgment under Federal Rule of Civil Procedure 60(b)(6).  169 F.3d at 545; *see also id.* at 547 ("[T]he district court abused its discretion by failing to exercise its power under Rule 60(b)(6) to set aside the default judgment and reduce the punitive damages award.").  For arbitration awards, similarly, excessive awards present "exceptional circumstances" and inherently offend public policy, warranting relief under the FAA.[3]

To be sure, some courts in other circuits have held that the Constitution does not *require* judicial review of an arbitrator's award of punitive damages, reasoning that arbitration awards lack the requisite state action.  *See, e.g.*, *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 940 (10th Cir. 2001); *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1193–94 (11th Cir. 1995); *Sanders v. Gardner*, 7 F. Supp. 2d 151, 174–76 (E.D.N.Y. 1998).  But those cases do not hold that punitive damages are somehow immune from the ordinary grounds for vacatur under the FAA, including where, as here, an award violates well-defined and dominant public policy or exceeds the scope of the arbitrator's authority.  *See* 9 U.S.C. § 10(a)(4); *PaineWebber*, 49 F.3d at 350.

*Sawtelle v. Waddell & Reed*, 304 A.D.2d 103, 108–10 (N.Y. App. Div. 2003), recognized this straightforward distinction in vacating an arbitrator's excessive punitive award.  There, New York's Appellate Division held that it was "besides the point" whether *Gore*'s constitutional holding applied in "private arbitration," and vacated the award because "arbitrary and irrational [punitive damages awards] under *Gore* should be equally arbitrary and irrational under the FAA."  *Id.*

---

[3] Nothing in *Stark v. Sandberg, Phoenix & von Gontard, P.C.*, 381 F.3d 793, 802–03 (8th Cir. 2004), is to the contrary.  There, the Eighth Circuit upheld an award against a challenge under the "manifest disregard" standard, a mode of judicial review that the Eighth Circuit subsequently held is foreclosed by Supreme Court precedent.  *Beumer Corp. v. ProEnergy Servs., LLC*, 899 F.3d 564, 565 (8th Cir. 2018) (citing *Hall Street Assoc's, LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008)).  *Stark* did not consider whether an excessive award exceeds an arbitrator's power or violates well-defined public policy, which are the arguments that UBS raises here.

**B.**      **The nearly $70 million punitive award imposed on UBS is impermissibly excessive and therefore contrary to public policy.**

In *State Farm*, the Court outlined "three guideposts" for determining whether a punitive award is grossly excessive:  (1) "the degree of reprehensibility" of the alleged misconduct; (2) "the disparity between the actual or potential harm suffered by the plaintiff" and the punitive award; and (3) the difference between the punitive award "and the civil penalties authorized or imposed in comparable cases."  538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).  Each factor demonstrates that $70 million wildly exceeds the outer limits of a permissible award in this case.

***Reprehensibility.***  In assessing reprehensibility, the Court considers: (1) whether the harm to the claimant was physical or economic; (2) whether the defendant "evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether the victims were "financially vulnerable"; (4) whether the conduct was repeated or isolated; and (5) whether the harm "was the result of intentional malice, trickery, or deceit, or mere accident."  *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1061 (8th Cir. 2014).

"Only the last two factors" even arguably weigh in favor of a higher award here, and the other three favor a smaller award—the harm was purely economic, UBS's and Burish's alleged misconduct "did not endanger anyone's physical health or safety," and Claimants are wealthy individuals who are "not financially vulnerable."  *Hallmark*, 758 F.3d at 1061.  Moreover, the *only* conduct that matters is Burish's and UBS's conduct with respect to Claimants themselves, not UBS's alleged misconduct involving others.  Punitive damages may not be used "for the purpose of punishing a defendant for harming others."  *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007).  A claimant cannot recover punitive damages "for wrongful behavior that they did not themselves suffer."  *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 796–97 (8th Cir. 2004); *see*

*also State Farm*, 538 U.S. at 422 ("A defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages.").

Indeed, where a corporate defendant's alleged misbehavior occurred nationwide, premising a punitive award on alleged "systematic abuses . . . in a case brought by [individual plaintiffs]" "deprives the defendant of the safeguards against duplicative punishment." *ConAgra*, 378 F.3d at 797. Similarly, principles of federalism forbid one State's laws from being used to punish conduct that occurred in other States. *Gore*, 517 U.S. at 572. "While each State has ample power to protect its own consumers, none may use the punitive damages deterrent as a means of imposing its regulatory policies on the entire Nation." *Id.* at 585.

Here, Claimants' main argument for imposing punitive damages on UBS concerned UBS's settlement with the SEC, where UBS paid the SEC $125 million for failing to retain financial advisors' text messages on a companywide basis during the same period that Burish allegedly failed to retain his text messages. Ex. E. Claimants argued that UBS had not "gotten the message," and that UBS's failure to punish Burish somehow breached its obligations to the SEC under the settlement. *Supra* at 4–6. Indeed, that was the only serious argument they made in favor of a punitive damages award that exceeded a 1:1 ratio to compensatory damages. Ex. B 47 (Claimants' Post-hearing Br. arguing that the "upper end of the 1-to-4 times range of punitive damages is warranted" because "the SEC's prior finding of willful and wanton conduct and substantial fine" was "ignored" by UBS).

Fundamental principles of public policy preclude this as a basis for awarding punitive damages. Claimants lack standing to enforce an SEC settlement order, and allowing them to do so under the guise of a state law punitive-damages claim intrudes on the SEC's regulatory and enforcement authority. Moreover, UBS's alleged failure to supervise employee communications

companywide is exactly the sort of "systemic abuses" that cannot support a punitive award to individual plaintiffs. *ConAgra*, 378 F.3d at 797. Tacking $70 million of punitive damages onto an SEC settlement that already imposed $125 million for the same alleged recordkeeping violations is obviously "duplicative." *Id.* And punishing UBS for conduct that occurred in other States and did not affect Claimants violates basic principles of federalism, by using the law of one State to "impose its own policy choice on neighboring States," *Gore*, 517 U.S. at 571.

To be sure, conduct that does not harm the claimants themselves can sometimes be considered for a defendant's recidivism. *ConAgra*, 378 F.3d at 797. But courts "must be careful not to let the exception swallow the rule" and must define "the relevant behavior . . . at a low level of generality." *Id.* Here, Burish's text messaging occurred years *before* the SEC settlement, and therefore cannot demonstrate recidivism. To the extent Claimants rely on UBS's statements during the arbitration as evidence that UBS had not "gotten the message," the company's defense of itself in litigation bears no resemblance to Claimants' allegations that Burish gave them bad investment advice—i.e., the "acts upon which liability was premised." *State Farm*, 538 U.S. at 422.

***Ratio.*** The Supreme Court has made clear that the maximum permissible amount of a punitive award depends in large part on the ratio between compensatory and punitive damages. *State Farm*, 538 U.S. at 424–25. Where compensatory damages are "substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425.[4]

---

[4] Higher ratios—sometimes even double-digit or higher—are justified when claimants suffer injury that is "hard to detect," *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005), or when a "particularly egregious act has resulted in only a small amount of economic damages," *Gore*, 517 U.S. at 582. Neither circumstance is even arguably present here.

Eighth Circuit precedent confirms *State Farm*'s admonition that a 1:1 ratio is generally the maximum where compensatory damages are "substantial." 538 U.S. at 425. In *Boerner*, the Eighth Circuit held that a $15 million punitive award was excessive where compensatory damages were approximately $4 million, even though, unlike here, the defendant's allegedly deceitful conduct "resulted in physical harm" causing the plaintiff's wife to suffer "a most painful, lingering death following extensive surgery." 394 F.3d at 602–03. The court reduced the punitive award to $5 million—for "a ratio of approximately 1:1"—to "comport with the requirements of due process." *Id.* at 603. In *ConAgra*, the Eighth Circuit reduced a punitive award from $6 million to $600,000—a 1:1 ratio to the plaintiff's compensatory damages—because a higher ratio would have "depart[ed] from the heartland of permissible exemplary damages." 378 F.3d at 799.

The Eighth Circuit has only rarely allowed punitive awards exceeding a 1:1 ratio where compensatory damages exceeded $1 million. *Ondrisek v. Hoffman*, 698 F.3d 1020, 1029, 1031 (8th Cir. 2012) (collecting cases). Those rare cases are easily distinguishable from this one—for example, none involved compensatory damages anywhere close to $23 million, and each involved far more egregious alleged misconduct.[5] The cases where the Eighth Circuit approves seven-figure or higher punitive awards generally involve ratios of 1:1 or lower. *See, e.g.*, *Hallmark*, 758 F.3d at 1061 (approving $10 million punitive award where compensatory damages were more than

---

[5] *See, e.g.*, *Ondrisek*, 698 F.3d at 1030–31 (reducing $60 million punitive award to $24 million, compared to $6 million in compensatory damages, where defendant physically and emotionally abused children); *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 824 (8th Cir. 2004) (reducing $18 million punitive award to $7 million, compared to $3.5 million in compensatory damages, where defendant engaged in "widespread and systematic" "trickery and deceit" across "six or seven offices and involving numerous groups of employees"); *Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 828–29 (8th Cir. 2004) (affirming $10 million in punitive damages compared to $2.1 million in compensatory damages where defendant engaged in "egregious" and "extraordinarily reprehensible scheme to defraud").

$21 million); *JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 875 (8th Cir. 2008) (approving $1.15 million in punitive damages where compensatory damages were $1.1 million).

UBS has not identified a single Eighth Circuit case authorizing a punitive award with a ratio higher than 1:1 where compensatory damages were higher than $10 million, let alone on facts similar to those here, where Claimants' alleged harm was exclusively financial. And in sheer dollar terms, the punitive award here is nearly seven times higher than the largest punitive award UBS has identified where the Eighth Circuit upheld the award and where, as here, the claimants suffered only economic harm. *See Eden Elec.*, 370 F.3d at 828 ($10 million). Similarly, UBS has not identified a single case where the Iowa Supreme Court authorized *any* punitive award greater than $2 million—a small fraction of the award here. *See Wilson v. IBP, Inc.*, 558 N.W.2d 132, 147 (Iowa 1996) (reducing award from $15 million to $2 million).

***Similar awards.*** The size of the award also departs dramatically from awards in similar cases and comparable civil sanctions. In federal cases involving similar claims, the highest upheld award UBS has identified was $2 million. *Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1223 (8th Cir. 1990) ($2 million for fraud, breach of fiduciary duty, and failure to supervise in case involving alleged unauthorized trading by securities broker); *see also Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 747 (8th Cir. 2003) ($45,000 for breach of contract and $1.25 million for breach of fiduciary duty in case involving losses related to futures contracts). Iowa cases involving purely economic harms are similar. *See Lakin v. Richards Farm Ltd.*, 862 N.W.2d 414 (Iowa Ct. App. 2015) ($1.4 million); *Schwickerath v. Anderson*, 990 N.W.2d 682 (Iowa Ct. App. 2022) ($200,000).

The award is wildly inconsistent with the most comparable civil sanction in Iowa—i.e., the sanction for "fraudulent practices." *Watkins*, 169 F.3d at 546 (looking to "fraudulent practices" as

providing the "comparable civil sanction" in Iowa commercial dispute). The sanction for fraudulent practices is $13,660, a tiny fraction of the nearly $70 million award here. *See* ICA § 714.9 (making a fraudulent practice involving over ten thousand dollars a class "C" felony); ICA § 902.9 (setting the maximum penalties for a class "C" felony).

To the extent other FINRA arbitrations are relevant to the analysis, the panel's award is again a dramatic departure from the norm. To UBS's knowledge, until the decision in this case only three FINRA arbitrations in the past 20 years resulted in punitive damages higher than $10 million. All involved punitive awards that were a fraction of the award here. *Robinson v. Oppenheimer & Co., Inc*, FINRA ID No. 21-02234 (Sept. 6, 2022) ($11.4 million), https://tinyurl.com/4538th9c; *Hosier v. Citigroup Global Markets, Inc.*, FINRA ID No. 09-03297 (Apr. 11, 2011) ($17 million), https://tinyurl.com/3ubnd2zu; *Hagman v. Citigroup Global Markets, Inc.*, FINRA ID No. 09-03251 (Oct. 6, 2010) ($10 million), https://tinyurl.com/2nz9e3y8.[6]

\*    \*    \*

Even assuming everything Claimants alleged during the arbitration is true, this case involved purely economic harm suffered by a group of wealthy businesspeople. At worst, UBS failed to supervise a single financial advisor's investment advice. And the panel more than fully compensated Claimants for their losses by awarding them approximately $25.5 million in compensatory damages. Under these circumstances, the maximum permissible punitive award would reflect a 1:1 ratio to compensatory damages, resulting in a total punitive award of $23,059,521.90. A punitive award of that magnitude would still be significant—higher than nearly any the Eighth

---

[6] Troublingly, less than two weeks after the award in this case, another FINRA arbitration panel issued an award of more than $79 million—demonstrating a growing risk of runaway punitive awards in FINRA arbitrations if courts do not enforce the fundamental principles of public policy reflected in the well-recognized limits applicable to punitive awards. *See Jannetti v. Stifel, Nicolaus & Co.*, FINRA ID No. 23-01342 (Mar. 12, 2025), https://tinyurl.com/mvt938ya.

Circuit has ever condoned, more than 10 times higher than the highest award the Iowa Supreme

Court has condoned, and more than 5,000 times higher than the most comparable civil sanction.

**II.    The award against UBS and Burish exceeds the panel's authority and violates well-defined public policy because it does not satisfy the threshold requirements of Iowa Code § 668A.1.**

The panel also exceeded its authority and violated well-defined Iowa public policy con-

cerning the threshold requirements for awarding punitive damages.  The Court need not look past

the four corners of the award to see why.  The panel relied on Iowa Code § 668A.1 as authority for

the punitive award.  *See* Award 3–4.  But the award fails to satisfy Section 668A.1's threshold

requirements for imposing punitive damages.  Indeed, by failing to address the proper allocation

of the punitive award under Section 668A.1(b) or make the requisite factual findings, the panel

"so imperfectly executed [its powers] that a mutual, final, and definite award upon the subject

matter submitted was not made."  9 U.S.C. § 10(a)(4).

**A.    Iowa law requires a factfinder to make two threshold determinations before awarding 100% of a punitive damages award to claimants.**

Iowa law mandates that a factfinder make two findings before awarding punitive damages.

*First*, an award "shall not be made" unless the factfinder makes a determination that "the conduct

of the defendant from which the claim arose constituted willful and wanton disregard for the rights

or safety of another."  ICA § 668A.1(1)(a).  *Second*, the factfinder must make a determination

"[w]hether the conduct of the defendant was directed specifically at the claimant, or at the person

from which the claimant's claim derived."  ICA § 668A.1(1)(b); *see also Shepherd Components,*

*Inc. v. Brice Petrides-Donohue & Assocs.*, 473 N.W.2d 612, 618 (Iowa 1991) (Section

668A.1(1)(b) requires the jury to indicate "whether the defendant's conduct was directed specifi-

cally at the claimant.").  Once the factfinder has made the required findings, and if the factfinder

did *not* determine that the conduct justifying punitive damages was directed "specifically at the

claimant," then the factfinder must determine what amount, up to a maximum of 25%, of the punitive award "may be ordered paid to the claimant," with the remainder to go to "a civil reparations trust fund administered by the state court administrator." ICA § 668A.1(2)(b).

These threshold requirements are not mere procedural formalities. "Iowa Code § 668A.1 plainly establishes *substantive* requirements for any award of punitive damages, thus defining the right to punitive damages" under Iowa law. *Harlan Feeders, Inc. v. Grand Lab'ys, Inc.*, 881 F. Supp. 1400, 1408 (N.D. Iowa 1995) (emphasis added). The statute "sets the standard for awarding punitive damages." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 395 (Iowa 2001).

Moreover, by mandating a default rule that the great majority of any punitive damages provide funding for a civil reparations fund, not the claimant, Section 668A.1(b) demonstrates Iowa's well-defined and dominant public policy of denying claimants an undue windfall—a policy that was blatantly violated here. Section 668A.1(b) "was designed to divert a portion of a resulting damage award to a public purpose." *Spaur*, 510 N.W.2d at 869.

## B.  The panel failed to make either of the threshold determinations required by Iowa law.

Here, the panel failed to make either of the findings required by Section 668A.1—instead, the panel merely cited to the statute, Iowa Civil Jury Instructions, and two Iowa cases defining willful and wanton conduct. *Supra* at 7. Citing a standard is obviously not the same thing as indicating with specific findings that the standard has been satisfied, which is what Section 668A.1 requires. Thus, the entire award violates Iowa law and public policy.

The Eighth Circuit's decision in *Brown v. Brown-Thill*, 762 F.3d 814, 824–25 (8th Cir. 2014), is instructive. There, the arbitrator removed a trustee based on statutory grounds under Florida and Missouri law. *Id.* at 824. Those grounds were "*exclusively* judicial" under state law, *id.*, and therefore "the arbitrator exceeded his powers by exercising the exclusively judicial

function of removing [the trustee] on *statutory* grounds," *id.* at 825. Here, similarly, the panel awarded punitive damages based on statutory grounds under Iowa law—Section 668A.1. Having invoked Section 668A.1 as the authority empowering them to render the award, the panel was bound to comply with Section 668A.1's requirements, but failed to do so.

The resulting windfall to Claimants is also inconsistent with "the rationale underlying Iowa's punitive damages legislation." *Varboncouer v. State Farm Fire and Cas. Co.*, 356 F. Supp. 2d 935, 950 (S.D. Iowa 2005). The award gave 0% of the punitive damages to Iowa's civil reparations trust fund—and 100% to Claimants—without the requisite finding that the underlying conduct was directed specifically at Claimants themselves. Award 3–4. And the panel's failure to address this threshold question likely changed the outcome. Claimants' requests for a massive punitive award were premised on their assertions that UBS systematically failed to retain communications by financial advisors throughout the nation, relying primarily on an SEC settlement that had nothing to do with Claimants themselves. *Supra* at 6.

By awarding Claimants four times the *maximum* share of the punitive award they could have been entitled to under Iowa law, the panel exceeded its authority, violated Iowa public policy mandating that the bulk of most punitive awards go "to a public purpose," and thereby demonstrated that the award lacked the necessary threshold considerations and findings that are a prerequisite to punitive damages under the very Iowa statute the panel cited. *Spaur*, 510 N.W.2d at 689. The panel also exceeded the boundaries of its power under the parties' agreements to arbitrate, which provided that the arbitration would be conducted in accordance with "applicable law"— here, Section 668A.1. *Supra* at 5; s*ee also* FINRA Rule 12904(a) ("All awards shall be in writing and signed by a majority of the arbitrators or *as required by applicable law*.") (emphasis added).

19

The panel's failure to consider (or satisfy) the threshold requirements of Iowa law is particularly problematic given FINRA's guidance to arbitrators, which specifically cautions that punitive damages "vary from state to state" and provides that the panel "should include in the award the basis for awarding punitive damages."  Ex. K 69 (Arbitrator's Guide).  Despite that guidance, the panel failed to provide any explanation of its award or even mention the factual findings required by Iowa law.  The lack of any explanation is especially egregious given the plain text of Section 668A.1 and the sheer size of the award—one of the largest in FINRA history, and many times larger than any the Eighth Circuit or Iowa Supreme Court has ever condoned.  *Supra* at 15–16.

These failures make clear that the panel's decision-making was fundamentally flawed and irreconcilable with public policy—the panel did not even complete the statutory prerequisites for awarding punitive damages or factor in the public-policy considerations inherent in Section 668A.1's requirement that, absent a specific factual finding, claimants may recover only 25% (at most) of punitive damages.  Because these failures undermine the validity of the panel's entire process, the proper remedy is vacatur of the entire award.  *See* 9 U.S.C. § 10(a)(4) (providing for vacatur where a panel exceeds its powers or they are so "imperfectly executed" "that a mutual, final, and definite award upon the subject matter submitted was not made").

## Conclusion

For these reasons, the Court should vacate the award entered by the arbitration panel in this case.  At minimum, the Court should strike, or at least reduce to a constitutionally permissible amount, the punitive damages portion of the award.  *See* 9 U.S.C. §§ 10, 11.

Dated:  March 31, 2025                          Respectfully submitted,

/s/  Tyler R. Smith_____            /s/ Matt Gregory_____
Tyler R. Smith  AT0013123                       Thomas G. Hungar*
Thomas J. Joensen  AT0003868                    Matt Gregory*
   *Lead Counsel*                 Emma Eisendrath*
GORDON REES LLP                                 Audrey Payne*
666 Grand Avenue, Suite 1701                    GIBSON, DUNN & CRUTCHER LLP
Des Moines, IA 50309                            1700 M Street, N.W., Washington, D.C. 20036
(515) 204-2844                                  (202) 955-8500
trsmith@grsm.com                                mgregory@gibsondunn.com
tjoensen@grsm.com

                                                Marshall R. King*
                                                GIBSON, DUNN & CRUTCHER LLP
                                                200 Park Avenue, New York, NY 10166
                                                (212) 351-4000
                                                mking@gibsondunn.com

                                                *Motion for admission pro hac vice forthcoming*

   *Attorneys for Petitioners UBS Financial Services Inc. and Andrew Burish*