**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **UBS FINANCIAL SERVICES INC. and ANDREW BURISH**, <br><br> **Plaintiffs**, <br><br> v. <br><br> **DENNIS HANSEN, LESLIE HANSEN, TYLER HANSEN, NOELLE HANSEN, BRADLEY NELSON, JORDAN NELSON, LINDSEY VALENTINI, NICHOLAS VALENTINI, AND MARK KRAMER**, <br><br> **Defendants**. | **Case No. 4:25-cv-00120-SMR-HCA** <br><br><br> **DEFENDANTS' BRIEF IN RESISTANCE TO PLAINTIFFS' MOTION TO VACATE** |

Defendants Dennis Hansen, Leslie Hansen, Tyler Hansen, Noelle Hansen, Bradley Nelson, Jordan Nelson, Lindsey Valentini, Nicholas Valentini, (the "Hansen Family") and Mark Kramer ("Kramer") (collectively "Defendants" or "Claimants") submit their Resistance Brief to Plaintiffs' Motion to Vacate as follows:

### Table of Contents

I.   Background: UBS Received an Appropriate Deterrent Following Yearslong Breaches of Fiduciary Duty, Culminating in Months of Fraud to Trusting Clients ....................................................................................................... 2

II.  Respondents Waived their Challenges by Failing to Object before the Arbitration Panel, Having Had a Full and Fair Opportunity to do so ...................... 5

III. Punitive Damages are Consistent with the Arbitration Agreement and the Intentional Torts at Issue, so Respondents' Public Policy Objections Fail ............... 8

IV.  Even if Punitive Damages were Reviewable, the Award is Not Excessive ............. 12

V.   The Arbitration Panel Need Not Have Found Conduct was Specifically Directed Claimants (as Courts and Juries Must), but it Did So. ............................. 24

VI.  Claimants Request that this Court Confirm the Award and Shift Fees ................... 29

VII. Conclusion ....................................................................................................... 30

1

I.    **Background: UBS Received an Appropriate Deterrent Following Yearslong Breaches of Fiduciary Duty, Culminating in Months of Fraud to Trusting Clients.**

Respondents[1] UBS Financial Services, Inc. ("UBS") and Andrew Burish ("Burish") of the Burish Group of UBS deliberately took advantage of their position as the longtime, trusted financial advisor of the Hansen Family and Kramer in pursuit of a business practice of substituting Burish's personal tolerance for ultra-high risk (inappropriate for his wealth management clients) in order to increase assets under management. Ex. 89,[2] p. 390, 392-393 ("UBS Star Advisor Andy Burish: The Power of Risk": "If I wasn't a risk taker, if I was afraid of things, we wouldn't have a ($3.8-billion-[assets under management]) practice with a town of 200,000 people."). Over a multi-year stretch, they deliberately and repeatedly violated industry standards designed to protect investors and the market.

Worse yet, as an ever-present risk of harm materialized and became internally visible at UBS, UBS sought to insulate itself—not its trusting clients—from harm when Claimants needed guidance the most. *See, e.g.,* Ex. 15. Respondents fraudulently withheld critical information that they had a duty to disclose, amplifying Claimants' losses instead of mitigating them. *Compare* Ex. 33 at 5 (withheld UBS analyst "neutral" position), *with* Ex. 38, p. 1, Ex. 93 at 3, *and* Ex. 224 ($70 price prediction despite $746.36 current market price); *see also* 5/18/2023 Hr. Tr. pp. 259:4-260:4; 5/15/2023 Hr. Tr. pp. 145-146; 5/17/2023 Hr. Tr. pp. 186-187; 5/19/2023 Hr. Tr. pp. 189-190; 5/20/2023 Hr. Tr. p. 215 (fraudulent non-disclosure that Burish was no longer was short selling alongside Claimants).

---

[1] For consistency with the underlying arbitration, UBS and Burish are referred to as "Respondents," and the Hansen Family and Kramer are referred to as "Claimants" herein.

[2] Exhibits referenced herein other than Defendants' Ex. A-E are those in Claimants' Appendix of Admitted Exhibits, attached hereto as Defendants' Ex. C, unless otherwise indicated.

Ultimately, UBS attempted to cast blame on Claimants for holding the short positions through margin calls that Burish advised them to meet when he sent them a cavalcade of price and performance predictions that Tesla's share price would decline in clear violation of industry standards. UBS did so knowing that there was never a time Burish made a recommendation that Claimants refused to follow (5/25/2023 Hr. Tr. 81:6-9, Burish: "No, I don't recall any time") as acknowledged by shocked internal UBS employee communication establishing that Burish was responsible (Ex. 19, "andy recommended they not sell because the technical guy said it was going to $200"; Ex. 20, "Yikes on Hansen, i can't believe he didn't close these guys out when he had the chance."). UBS even sought to legitimize Burish's willful deletion of inculpatory evidence by falsely characterizing the texting that occurred as a "gray area" throughout this arbitration. *Compare* 5/23/2023 Hr. Tr. at 96:5-12; 11/16/2023 Hr. Tr. at 47:14-20, *with* 11/7/2024 Hr. Tr. at 8:10-12, 50:25-51:4 (no gray area), *and* Ex. 501a at 2 ("FINRA has been rather clear for years that business-related texts have to be preserved").

Because investors place their trust in investment advisors who hold themselves out as experts, the investment industry has professional duties of care to ensure that a recommended investment strategy, including a hold recommendation, is suitable (Ex. 122, Rule 2111, Financial Industry Regulatory Authority ("FINRA") Rule 2111.03); that advisors do not market risky investments by touting their own participation in the investment strategy (11/4/2024 Hr. Tr. at 98:23-99:14); that customer communications are "fair and balanced" and do not "predict or project performance" (Ex. 123, p. 5, FINRA Rule 2210(d)(1)); that information they are duty bound to disclose is not withheld (FINRA Rule 2210(d)(1)(A)); and that brokers like UBS adequately supervise employees like Burish (FINRA Rule 3110(a), Ex. 124). Respondents repeatedly breached each of these industry rules. Defendants' Ex. A, Hr.

Tr. 5/15/2023-12/11/2024; Defendants' Ex. B, Recordings; Defendants' Ex. C, Claimants' App. of Exhibits; Doc. 1-3, Claimants' Post-Hearing Brief.

Respondents' current characterization of what happened in this case bears little resemblance to the actual record (39 days of evidence and argument). It excludes voluminous evidence of systematic, deliberate violations of industry standards and fraud, carried out deliberately and with knowledge of the risk of harm to the Claimants.[3] The basis for punitive damages was detailed throughout the lengthy hearing and in extensive post-arbitration briefing. *Id.* It arises from knowing and deliberate breaches of fiduciary duty and fraud that amplified instead of mitigated risk to their trusting clients for the chance to grow assets under management, compounded by the attempt to misleadingly paper over the misdeeds and/or delete the evidence entirely. *Id.* The 39-day record the panel considered (which UBS chose not to submit)[4] is replete with evidence that UBS's professional duties of care were systematically ignored, in knowing and deliberate breach of trust to their loyal clients. *See id.*; *see also* Doc. 1-14, Award ("[C]onsidering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions . . .").

Claimants prevailed on claims of breach of fiduciary duty, violation of FINRA suitability rules, failure to supervise/negligent supervision, and fraudulent non-disclosure against UBS and Burish. Compensatory damages totaling $25,621,691 were well-managed portfolio damages as of the April 2023 pre-hearing disclosure deadline for expert materials.

---

[3] This is to be expected where, as here, appellate counsel did not try the case.

[4] As UBS well knows, this, alone, waives UBS and Burish's objections. *Munizzi v. UBS Fin. Servs., Inc.*, 202 N.E.3d 358, 367 (Ill. App. 2021); *see also* UBS's Opposition to Petitioner's Motion for Summary Judgment, *Paynter v. UBS Financial Services Inc.*, No. 2:21-cv-002024-DJH, Doc. 25 at 7 (p. 6) (D. Ariz. May 25, 2022) ("Because Paynter failed to provide a full and complete record for this Court's review, he cannot establish any of the statutory grounds for vacatur and his Petition to Vacate must be rejected on those grounds alone.").

*See* Ex. 87c, 87d, 87e, 87f, 87g; Award at 3-4. The Award allocates 90% of compensatory damages to UBS and 10% to Burish. *Id.* Punitive damages against UBS are a 3-to-1 ratio to its compensatory damages. *Id.* Punitive damages against Burish were $100,000 for each of the five groups of investors—one individual and four spouses. *Id.*

UBS's arbitration contract states that "[a]rbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited." *See, e.g.,* Doc. 1-20 at 26. "The arbitrators do not have to explain the reason(s) for their award, unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date." *Id.*; *see also Principal Sec., Inc. v. Gelbman*, 17 N.W.3d 107, 114 (Iowa 2025), *reh'g denied* (Mar. 5, 2025) (same); Doc. 1-10 at 99, FINRA R. 12904(g)(3) (same). "The rules of the arbitration forum in which the claim is filed, and any amendments to them, shall be incorporated into this Agreement." Doc. 1-20 at 27. FINRA specifically authorizes the award of punitive damages: "Upon a party's request, <u>arbitrators may consider punitive damages as a remedy</u> if a respondent has engaged in serious misconduct that meets the standards for such an award." Doc. 1-12 at 70, FINRA Arbitrators' Guide (emphasis added).

The Award is appropriate for knowing and deliberate misconduct resulting in substantial harm, and designed to deter this global investment bank. UBS may not sacrifice professional duties of care, even if Burish's personal high-risk tolerance is more lucrative.

## II. Respondents Waived their Challenges by Failing to Object before the Arbitration Panel, Having Had a Full and Fair Opportunity to do so.

Each of Respondents' objections are barred because arbitration counsel failed to raise them to the panel, and Respondents may not raise objections for the first time in district court:

Appellants' public policy argument that the confirmation of the award does not promote franchise markets also fails. Appellants have waived this argument, as they raised it for the first time in their brief to this court. When a party "who contests the merits of an arbitration award in court fails to first present the challenges on the merits to the arbitrators themselves, review is compressed still further, to nil."

*Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 489 (8th Cir. 2010) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.,* 380 F.3d 1084, 1101 (8th Cir.2004)) (emphasis added). This "rule serves the salutary purposes in preventing 'sandbagging' by the losing party, and the inequity that results from a party challenging 'the legitimacy of the arbitration process, in which he had voluntarily participated over a period of several months.'" *Glass-Inspiration GMBH v. McGrath, Inc.*, No. 24-CV-3315, 2025 WL 303946, at *3 (D. Minn. Jan. 27, 2025) (quoting *Boehringer Ingelheim Vetmedica, Inc. v. United Food & Com. Workers*, 739 F.3d 1136, 1140 (8th Cir. 2014); *Lewis v. Cir. City Stores, Inc.*, 500 F.3d 1140, 1149 (10th Cir. 2007)) (citations omitted).

To make matters worse, UBS knows better. When UBS previously sought to *confirm* an arbitration award, it argued "[t]he failure to pose an available argument to the arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award." Defendants' Ex. D at 8, *Rudwall v. UBS Financial Services Inc.,* No. 1:24-cv-07627, Doc. 10 at 8, UBS's Response in Opp. to Motion to Vacate Arbitration Award and in Support of UBS' Pet. to Confirm, (N.D. Ill.) (quoting *Ganton Techs., Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W., Loc. 627*, 358 F.3d 459, 462 (7th Cir. 2004)).

Even in court, failure to object to punitive damages on due process grounds in trial court waives appellate review. *Banker's Life and Casualty Co. v. Crenshaw,* 486 U.S. 71, 76-77 (1988); *Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257 (1989).

As to each of Respondents' arguments in their Motion to Vacate, regarding alleged excessiveness and application of Iowa Code § 668A.1(1)(b), UBS had a full and fair opportunity to present those issues to the panel but failed to do so. UBS failed to object to the Eighth Circuit citation Claimants presented supporting the ratio of punitive damages awarded or to request an explained decision to detail their conclusion that misconduct was specifically directed at Claimants, so they waived the opportunity. On December 6, 2024, Claimants' arguments to the panel cited Eighth Circuit precedent authorizing punitive damages in cases of economic harm up to four times actual damages. Doc. 1-5 at 41, 12/6/24 Hr. Tr. at 39:1-9. In conjunction with a four-times multiplier, Claimants requested up to $36 million in compensatory damages. Doc. 1-5 at 28, 12/6/24 Hr. Tr. at 26:6-8. During Respondents' closing, conducted from Friday, December 6, 2024, and continued after the weekend on Monday, December 9, 2024, Respondents failed to object or offer some other, lower ratio.

The panel granted until January 24, 2025, to submit 50-page briefs. UBS and Burish's brief reiterated factual argument regarding intent, Doc. 1-13 at 54-55 (pp. 47-48), but did not alert the panel that they disagreed with the Eighth Circuit case law Claimants cited authorizing punitive damages up to four times the $36 million in actual damages requested, nor did they attempt to belatedly request an explained decision for section 668A.1(1)(b). Respondents' brief does not reference a punitive damage cap, any objections to the SEC Order Respondents cite in their Motion to Vacate (Doc. 1-6, Ex. 45), or section 668A.1. Doc. 1-13.

The Award assessed compensatory and punitive damages underneath the requested range, at a 3-to-1 ratio for UBS and a 0.2-to-1 ratio for Burish (averaging across all Claimants). Doc. 1-14 at 4-5, Award. The panel's punitive damage findings cite the model Iowa Civil Jury

Instructions, Iowa Code § 668A.1; and *McGough v. Gabus*, 526 N.W.2d 328,334 (Iowa 1995)

(quoting *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911,919 Iowa 1990). *Id.*

All of UBS's challenges are "compressed . . . to nil" because they failed to "first present

the challenges on the merits to the arbitrators themselves*." Med. Shoppe Int'l,* 614 F.3d at 489.

### III.    Punitive Damages are Consistent with the Arbitration Agreement and the Intentional Torts at Issue, so Respondents' Public Policy Objections Fail.

There is no public policy favoring yearslong, intentional breaches of professional

duties of care against trusting clients, culminating in months of fraud at the very time that

professional advice was needed the most. *See, e.g., Munizzi v. UBS Fin. Servs., Inc.*, 2021 IL App

(1st) 201237, ¶ 37, 202 N.E.3d 358, 367 (affirming punitive damage award over public policy

objection: "[t]here is no public policy favoring false or defamatory disclosures by

employers."). UBS and Burish admit that the Panel had authority to award punitive damages

in FINRA arbitration, Doc. 1-1 at 5. There is also no dispute that public policy authorizes

punitive damages for willful and wanton tortious conduct, and that a 3-to-1 ratio of

compensatory damages to punitive damages is below what the Eighth Circuit has approved

for economic loss. *See, e.g., Grant v. Zorn*, 107 F.4th 782, 800 (8th Cir. 2024). Instead,

Respondents disagree with the panel's findings. Namely, that deliberate misconduct warrants

the deterrence meted out to ensure that UBS does not knowingly turn a blind eye to Burish

and fulfills its professional duties instead of sponsoring a protracted effort to shelter its $3.8

billion broker from oversight to preserve his rule-violative business strategy.

"The award of an arbitration panel is subject only to very limited scrutiny." *Lee v.*

*Chica*, 983 F.2d 883, 888 (8th Cir. 1993) (arbitrators had not "exceeded their powers," public

policy did not prohibit punitive damages unavailable under state law, and reinstating punitive

damage award vacated by district court). "Courts have no authority to reconsider the merits

of an arbitration award," even when the challenging party alleges serious errors of law or fact. *Med. Shoppe Int'l*, 614 F.3d at 488. "In deciding whether an arbitrator has exceeded contractual authority, the contract 'must be broadly construed with all doubts being resolved in favor of the arbitrator's authority.'" *Exec. Life Ins. Co. of New York v. Alexander Ins. Ltd.*, 999 F.2d 318, 320 (8th Cir. 1993) (reversing district court vacatur of award) (quoting *Lackawanna Leather Co. v. United Food & Commercial Workers Int'l Union,* 706 F.2d 228, 230–31 (8th Cir.1983)).

Under the FAA, only statutorily enumerated grounds can be relied on to refuse to enforce an award. *See Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008) ("On application for an order confirming the arbitration award, the court 'must grant' the order 'unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.' There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies."). Consequently, violation of public policy is not an available basis to vacate an award. *See Med. Shoppe Int'l*, 614 F.3d at 489 (citing *id.* at 586) ("*Hall Street,* resolving a circuit split, held that 'the text [of the FAA] compels a reading of the §§ 10 and 11 categories as exclusive.'"); *Seldin v. Est. of Silverman*, 939 N.W.2d 768, 787 (Neb. 2020), *cert. denied*, 141 S. Ct. 2622 (2021) ("We hold that under the FAA, a court is not authorized to vacate an arbitration award based on public policy grounds because public policy is not one of the exclusive statutory grounds set forth in § 10 of the FAA.").

Even if the doctrine applied, "[o]nly a 'well defined and dominant' public policy arising from 'laws and legal precedents' will trump an arbitration award—'general considerations of supposed public interests' are not enough." *Entergy Operations, Inc. v. United Gov't Sec. Officers of Am. Int'l Union*, 856 F.3d 561, 564 (8th Cir. 2017) (quoting *W.R. Grace &*

*Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461

U.S. 757, 766 (1983)) (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

Public policy doctrine was rooted in "the basic notion that no court will lend its aid to

one who founds a cause of action upon an immoral or illegal act," which gave rise to the

ability to "refuse to enforce contracts that violate law or public policy." *United Paperworkers*

*Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42 (1987). It arose in labor and employment

arbitration following employee reinstatement in explicit violation of law. *See, e.g., Iowa Elec.*

*Light & Power Co. v. Loc. Union 204 of Int'l Bhd. of Elec. Workers (AFL-CIO)*, 834 F.2d 1424, 1426

(8th Cir. 1987) (employee "was short-circuiting an important safety system <u>required by the</u>

<u>federal government</u> as a measure to protect the public from exposure to harmful radiation,"

and "<u>the award returning Schott to work would violate the public policy of this nation</u>

<u>concerning strict compliance with safety regulations at nuclear facilities</u>") (emphasis added).

Even then, the bar is high. *See PaineWebber, Inc. v. Agron*, 49 F.3d 347, 351 (8th Cir. 1995)

("Although it is easy to agree that there is a dominant policy requiring honesty in the securities

industry, this policy is not so well-defined as it relates to the panel award at issue.").

Punitive damages, by contrast, are authorized under the FINRA arbitration rules

incorporated into the parties' arbitration agreement and for the intentional torts Respondents

committed (fraud, breach of fiduciary duty, breach of professional duties of care). Doc. 1-12

at 70, FINRA Arbitrators' Guide; Doc. 1-14, Award. Far from a well-defined public policy,

UBS advances cases addressing different facts and dicta regarding (inapplicable) Due Process

review. Respondents have no right to review on either of the grounds asserted—public policy

and/or the panel having allegedly "exceeded their powers" under 9 U.S.C. § 10(a)(4)).

For instance, in *Stark v. Sandberg, Phoenix & von Gontard, P.C.*, the Eighth Circuit rejected a movant's argument that an "award of punitive damages was excessive and made in manifest disregard of the law," concluding that "[b]ecause we conclude the arbitration agreement unambiguously *permitted* the award of punitive damages, we hold the award of punitive damages was proper and reverse the district court." 381 F.3d 793, 799–800 (8th Cir. 2004) (emphasis in original). Respondents attempt to distinguish *Stark* by arguing that manifest disregard for the law is no longer a legitimate basis to contest an award, and they instead assert that the panel exceeded its power or violated public policy. Doc. 1-1 at 10, n.3. This ignores that legal developments foreclosing "manifest disregard for the law" review under the FAA resulted in contraction of grounds for review, not an expansion. If arbitrators do not manifestly disregard the law for an allegedly excessive punitive damage award where the arbitration agreement permitted the award of punitive damages (*Stark*), it stands to reason that arbitrators also do not exceed their power or violate public policy even if the more expansive manifest disregard of the law standard no longer controls. The barrier to vacating an allegedly excessive punitive award rose higher when manifest disregard was eliminated.

Courts do not recognize a public policy challenge as an appropriate basis to overturn an arbitration award for punitive damages. *See Munizzi*, 202 N.E.3d at 367 (rejecting UBS public policy argument to set aside punitive damages); *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 940 (10th Cir. 2001) ("Amoco may not now oppose the very process it advocated and to which it voluntarily submitted.")[5]; *Sarofim v. Tr. Co. Of The W.*, 440 F.3d 213, 219–20 (5th Cir.

---

[5] Respondents mischaracterize *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 940 (10th Cir. 2001) arguing that the court reasoned that "arbitration awards lack the requisite state action," Doc. 1-1 at 10. The court explicitly declined to reach that issue. *Bowen*, 254 F.3d at 940. Instead, the losing party foreclosed any due process argument by agreeing to arbitration rules that authorized the relief awarded (as UBS has done here). *See Bowen*, 254 F.3d at 940.

2006) (punitive damages awarded satisfied public policy of punishment and deterrence "to caution financial advisers against operating in the same manner"); *Kerr v. John Thomas Fin.*, No. 14-CV-8306 KBF, 2015 WL 4393191, at *7 (S.D.N.Y. July 16, 2015) (applicable law authorized punitive damages for the tort action, the panel cited the controlling punitive damage statutory standard, and the panel properly awarded punitive damages so no vacatur on grounds of public policy would be ordered).

In addition to agreeing to be bound by the panel's determination of punitive damages (foreclosing the opportunity for district court review under the FAA), Respondents' challenge is also barred for the standalone reason that it invokes Due Process Clause standards for excessiveness that do not apply in private arbitration. *See Stark*, 381 F.3d at 803 (8th Cir. 2004) (quoting *Lee*, 983 F.2d at 889 (Beam, J. concurring in part and dissenting in part)) ("In the arbitration setting we have almost none of the protections that fundamental fairness and due process require for the imposition of this form of punishment. Discovery is abbreviated if available at all. The rules of evidence are employed, if at all, in a very relaxed manner. The factfinders (here the panel) operate with almost none of the controls and safeguards [present in traditional litigation.]"); *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995) ("[W]e agree with the numerous courts that have held that the state action element of a due process claim is absent in private arbitration cases.").

## IV.    Even if Punitive Damages were Reviewable, the Award is Not Excessive.

### A.    UBS's Conduct Toward its Trusting Clients was Reprehensible.

The panel's punitive damage award resulted from multiple years of repeated breaches of fiduciary duties, committed by Claimants' trusted professional advisor at UBS, culminating in months of fraud, ignored opportunities to mitigate losses (including when Tesla dropped

below UBS's own analysts' price target because of Burish's reliance on an unidentified "technical guy" who supported his minority view conviction that the strategy would turn profitable), and no effort to meaningfully place checks on the named leader of the Burish Group, all resulting in $25.6 million actual harm pursuing a strategy capable of wiping out far more. *See* Doc. 1-14, Award; *see also, e.g.,* Ex. 87c at 101 (illustrating potential loss of more than $30 million in the ensuing months and up to $96 million in the ensuing years for Dennis and Leslie). Throughout 39 days of hearing, the panel assessed the need to deter UBS, a global investment bank, exercising professional duties of care overseeing the $3.8 billion Burish Group empire. The panel considered underlying events, testimony, and argument that signaled UBS was poised to continue business as usual in the Burish Group. The panel did so as qualified FINRA arbitrators and trained lawyers who UBS agreed to engage.

Even if UBS can reach the merits of its challenge (it cannot, as detailed above), the Award is justified. Due Process considerations include whether "the conduct involved repeated actions or was an isolated incident" and "was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996)).

The circumstances here are analogous to those in *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 67 (Ky. 2018), which dealt with the same two *Gore* factors in a case of $20 million economic harm caused by a trusted financial professional resulting in an affirmed $80 million punitive award (4-to-1 ratio). The plaintiffs, William and Martha Yung, brought a claim against their accounting firm for fraud and professional negligence after it approached them and recommended a tax shelter that was ultimately disallowed by the IRS causing back taxes, interest, and penalties. *Id.* at 30, 49. The defendant, Grant Thornton, LLP, ("GT") knew the

plaintiffs did not want to be "guinea pigs" for the tax strategy but proceeded nonetheless. *Id.* at 66. As problems arose, GT internally discussed them but failed to inform their trusting clients. *Id.* at 67. "These various misrepresentations and nondisclosures were made to save the $900,000 deal and to cover GT's negligent and fraudulent acts that accumulated over time." *Id.* The "individual and cumulative acts place GT's behavior toward their clients at the high end of *professional reprehensibility*." *Id.* (emphasis in original). Wealth is not a safe harbor: "Although the Yungs may not have been financially vulnerable, the reprehensibility of GT's orchestrated, on-going deceit is not lessened or mitigated by the fact GT defrauded people of wealth, rather than the financially vulnerable." *Id.*

Beyond *Yung*, "deceitful, self-serving, and financially damaging" breaches of fiduciary duty resulting solely in financial harm in relationships of trust have warranted punitive damages far in excess of that found here. *Time Warner Ent. Co. v. Six Flags Over Georgia, LLC*, 563 S.E.2d 178, 185 (Ga. App. 2002) (affirming $257 million punitive award on $197 million economic harm) ("Even though Flags and Fund were . . . controlled by 'sophisticated business people,' they were nevertheless entitled to rely on their general partner.").

UBS and Burish deliberately breached their professional duties designed to protect Claimants, their longtime trusting clients, in pursuit of a successful business model dependent on risk to grow overall assets under management. Ex. 89, p. 390, 392-393. They fraudulently withheld information that would allow Claimants to mitigate losses, and then they attempted to cover up the wrongdoing by deleting evidence and altering internal records. The panel reviewed 39 days of record of evidence and argument, including the following (and far more):

- UBS knowingly and deliberately failed to supervise suitability by greenlighting an obviously unsuitable short selling strategy that inherently entails risk far beyond what

Claimants had the experience (or account designation) to tolerate. 5/19/2023 Hr. Tr. at 24:11-16 (unsuitable per former UBS advisor); 5/25/23 Hr. Tr. at 133:9-13 (risk); Ex. 61 at 6 (account designated "risk to principal").

- UBS deliberately altered an account risk designation from "moderate" to "aggressive," while the short position was worsening, without any discussion with their clients that this strategy was inadvisable in an account where disclosed risk was limited to the risk to principal, let alone with only moderate risk to principal. Ex. 15; Ex. 61 at 6.

- UBS knowingly failed to intervene and prevent harm even after a complaint from another, non-party Burish customer surfaced identical concerns. Ex. 24.[6]

- UBS and Burish deliberately withheld analysts' (even its own) outlook on Tesla as it began to depart from Burish's personal, bearish views. *Compare* Ex. 1, 1a, 3, 8, 9, 10 (reports sent prior to 2020), *with* Ex. 33 at 5 (summary of changes withheld, including the monumental change to "neutral" on March 24, 2020, Ex. 33 p. 5, mere days after UBS admitted that "Andy recommended they not sell because the technical guy said it was going to $200," Ex. 19); *and* Ex. 126 (majority of professional analysts opinions that Tesla was undervalued (buy) or fairly valued (neutral) withheld).

- UBS and Burish knowingly entered a note in its customer relationship management ("CRM") software days after a critical event in an attempt to create a record of an event that never happened as described. Ex. 21 (depicting note with a created date of 04/01/2020—after UBS changed to neutral on March 24, 2020, and Tesla's price had risen substantially—concerning a conversation on March 18, 2020); (UBS Branch

---

[6] Pursuant to the Panel's order compelling discovery, UBS produced information of other customers Burish advised to short sell Tesla with names redacted (Customers A through I).

Manager: "I have also added your note when you spoke about covering the short at $362 in March."); Exhibit 128 at 12.

- UBS allowed Burish to "game the system" with a false narrative in note keeping software, then used this as the official timeline throughout arbitration. *Compare, e.g.,* Ex. 128 at 13 (January 30, 2020, entry regarding "TSLA Short" for Dennis Hansen states that "[h]e compared it to 'Bitcoin on wheels,'"), *with* Ex. 34 at 125 (hyperlink sent by Burish), Ex. 89, p. 601 ("Tesla is bitcoin on wheels"); *see also* 7/25/2024 Hr. Tr. at 136:5-7 (UBS expert: "But clients don't see what [a] broker puts in the CRM a broker who is trying to game the system could use it to their advantage.").

- UBS and Burish repeatedly betrayed the trust Claimants placed in them by sending unreliable information and failing to help Claimants by contacting them to correct misinformation even when discovered. *See, e.g.,* Ex. 28; Ex. 128, p. 13 (research sent by Burish authored by college students predicting Tesla's "path to bankruptcy"); Ex. 29 ("not an approved 3rd party research").

- UBS knowingly ignored opportunities to mitigate losses in the accounts it managed. *See, e.g.,* Ex. 34, p. 133 (Burish March 15, 2020, Mr. Burish predicted "Tesla below 300"); Ex. 224 at 5 (March 18, 2020, $361.22 closing price); Ex. 33 at 5 ($410 UBS 12-month price target); Ex. 19 (UBS employee: "well andy recommended they not sell because the technical guy[7] said it was going to $200"); Ex. 20 (UBS employee: "Yikes on Hansen, i can't believe he didn't close these guys out when he had the chance.").

- UBS knowingly failed to perform basic inquiry under its professional duties of care to review and put a stop to an unmitigated barrage of unfair and unbalanced price and

---

[7] This "technical guy" was never identified by UBS, nor called to testify.

performance predictions that Burish sent for years. *See* Ex. 40 and 41 (voicemails predicting price and performance); Ex. 34-39 (text messages); Ex. 89-93 (articles texted); Ex. 88 (summary of contacts); *see also, e.g.,* Ex. 93, p. 3 ("Tesla stock will hit $70 a share"); Ex. 38, p. 1 (text); Ex. 224 ($746.36 closing price April 20, 2020).

- Burish deliberately deleted hundreds of text messaged price and performance predictions knowing precisely why they should be retained (so "they can see if . . . you're misleading clients . . . you're going against our recommendations at the firm . . . ."), and UBS knowingly allowed this to occur by ignoring obvious messaging and sheltering Burish from scrutiny. 5/23/2023 Hr. Tr. at 85:12-18; 5/25/2023 Hr. Tr. at 82:10-83:3; 5/19/23 Hr. Tr. at 28:14-21 ("Q. How do you know that? A. Because I saw him do it."); 5/25/23 Hr. Tr. at 31:4-10; 11/7/2023 Hr. Tr. at 85:12-16.

- UBS perpetuated the false narrative that texting was a "gray area" based on comments attributed to a former UBS branch manager it did not name as a witness. 5/23/2023 Hr. Tr. at 96:5-12; 11/16/2023 Hr. Tr. at 47:14-20. Claimants located him to testify in rebuttal, and he refuted this. 11/7/2024 Hr. Tr. at 8:10-12; *id.* 50:25-51:4; *see also* Ex. 501a at 2 (UBS expert: "FINRA has been rather clear for years").

- UBS failed to take any remedial action toward Burish and his communication violations, even after those violations resulted in tens of millions of dollars in harm to Claimants. 11/7/2023 Hr. Tr. at 8:21-25.

- UBS's branch manager admitted, under oath, that Burish was "not reasonably supervised by" himself "and others in the supervision and compliance department at UBS". 11/7/2023 Hr. Tr. at 43:16-21 ("That's correct."); *c.f.* 11/8/2023 Hr. Tr. at

155:1-6, 7/26/24 Hr. Tr. at 161:5-162:22 (UBS Managing Director: Tesla short selling "debacle")

Respondents' false claim that "Claimants' main argument for imposing punitive damages on UBS concerned UBS's settlement with the SEC," Doc. 1-1 at 12, ignores the arbitration record. The Award draws on all 39 days of "testimony and evidence presented at the hearing," not the portions of testimony appellate counsel excised. UBS's actions toward its trusting clients were reprehensible and the level of deterrence awarded is warranted to ensure that UBS observes professional obligations to customers in the Burish Group of UBS.

### B. A 3-to-1 Ratio is in Range for Fraud by a Trusted Professional Advisor.

The 3-to-1 punitive damage ratio assessed against UBS reflects the panel's judgment on the level of deterrence appropriate for fraud and breach of fiduciary duty by a trusted professional advisor that risked tens of millions of dollars in pursuit of a risk-based business strategy calculated to increase overall assets under management of the $3.8 billion Burish Group. The panel determined that a 1-to-1 ratio—a purported limitation asserted for the first time by UBS in its Motion to Vacate—would be insufficient for this global investment bank.

As a trusted professional advisor in the business of advising wealthy clients regarding their investments, deterrence necessarily looks different for UBS based on the highly reprehensible nature of its conduct with multiple customers over a period of years. The substantial resources it possesses calls for a significant award. Cases UBS cites fail to "capture[] the essence of the culpability in the instant case—repeated fraudulent conduct in the form of misrepresentations and omissions by a trusted professional advisor." *Yung*, 563 S.W.3d at 70 (emphasis added). *Yung* even examined the following dicta in concerning ratio principles in *State Farm*:

> First, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Second, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Third, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."

*Yung*, 563 S.W.3d at 69 (quoting *State Farm,* 538 U.S. at 425) (citations omitted) (emphasis added). The professional advisor there, as here, "not surprisingly, emphasizes this third point." *Id.* Still, "ratios must be assessed on a case-by-case basis," and the "egregious and highly reprehensible conduct" by the trusted professional advisor warranted the 4-to-1 ratio. *Id.* at 72. Beyond this, the ratio "is significantly lower when taking into consideration potential harm." *Id.*; *see also Dunne v. Res. Converting, LLC*, 991 F.3d 931, 939 (8th Cir. 2021) ("We are to consider both actual harm *and potential harm*.") (emphasis added).

The Kentucky Supreme Court's holding in *Yung* is instructive because it addresses a professional relationship with trusting clients most analogous to those here, and examined the ratio in light of the record facts as opposed to exclusively relying on the *State Farm* dicta Respondents also advance here. Specifically, *Yung* affirms a 4-to-1 ratio entered by a judge in a bench trial resulting from reprehensible and ongoing fraudulent non-disclosure by a trusted professional advisor with $20 million compensatory damages and $80 million punitive damages. By comparison, the panel awarded $23 million in compensatory damages against UBS and $69 million in punitive damages among the nine Claimants. Doc. 1-14 at 4-5, Award. As to the risk of loss, the full measure of their harm through the end of the arbitration

was upwards of $36 million[8] (a 2-to-1 ratio). *See* Doc. 1-3 at 44, Claimants' Post-Hearing Brief at 40. Further, Tesla's stock price history demonstrates that values could have wiped out a collective $130 million (a 0.5-to-1 ratio), to say nothing of the potential harm had the price run faster and higher. Ex. 87c at 101, 87d at 112, 87e at 119, 87f at 113, 87g at 91; 11/8/2024 Hr. Tr. at 90:5-16, 101:15-24, 103:9-18.[9]

The Eighth Circuit authorizes ratios beyond the 3-to-1 ratio applied here. *Stark*, 381 F.3d at 798, 803 (8th Cir. 2004) ("We reverse the district court's order vacating the award of punitive damages and remand with instructions to confirm the arbitrator's award in its entirety."; i.e., 176-to-1 ratio of $6 million punitive damages and $34,080 compensatory damages); *see also Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824 (8th Cir.2004) (affirming 4.8-to-1 ratio of $10 million in punitive damages on $2.1 million compensatory damages); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827 (8th Cir.2004) (after an award of $5 million punitive damages on $500,000 compensatory damages, reducing punitive damage award to 4-to-1 ratio); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820 (8th Cir.2005) (affirming 4-to-1 ratio of $2,660,000 punitive damages on $665,000 compensatory damages); *Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001 (8th Cir.2008) (affirming 8.4-to-1 ratio on $1,044,445 punitive and $125,000 compensatory damages).

Ultimately, the Panel's award is within the range of acceptable ratios for cases of economic harm, particularly when viewing the gravity of breaches of professional duties of care and fraud to trusting clients of professional advisors.

---

[8] Compensatory damages awarded reflect April 2023 Well-Managed Portfolio sums. Doc. 1-3 at 44, Claimants' Post-Hearing Brief at 40. The damages increased with market growth in the ensuing year and a half. *Id.*

[9] UBS put no guardrails in place to trigger any automated sale if the price reached any threshold. *See* 5/22/23 Hr. Tr. 171:5-15 (Burish: "I don't use those for short strategies.")

**C.    UBS Ignores a Comparable Civil Penalty Involving Far Less Severe Misconduct than What Occurred Here.**

Global investment banks like UBS serve in a position of trust, and civil penalties imposed for violations of their duties are commensurate with their size and responsibilities to investors and the market. *See, e.g.,* 11/6/2024 Hr. Tr. 119:9-18 (UBS expert: $125 million not remarkable). Whereas UBS would have this Court analogize Iowa criminal fraud monetary penalties under Iowa Code §§ 714.9 and 902.9, Doc. 1-1 at 16, (disregarding that the deterrence is principally achieved through a lengthy period of incarceration),[10] the SEC and FINRA are aware that far more is required to meaningfully deter global investment banks. Thus, "[c]omparing the punitive damage award and the civil or criminal penalties that could be imposed for comparable misconduct," *BMW*, 517 U.S. at 583, implicates comparable investment banks and comparable actions.

UBS's misconduct is a far more severe instance of the widespread prohibited text messaging and a willful failure to reasonably supervise its employees resulting in a fine of $125 million by the SEC. Ex. 45, SEC Order. In this Order, UBS acknowledged that it is bound by "recordkeeping requirements" and "compliance with these requirements is essential to investor protection. *Id.* ¶ 1. Recordkeeping requirements are "primary means of monitoring compliance with applicable securities laws." *Id.* ¶ 12. UBS admitted a "widespread and longstanding failure of UBS employees throughout the firm, including at senior levels, to adhere to certain of these essential requirements and the firm's own policies" due to text

---

[10] *See Dunne v. Res. Converting, LLC*, 991 F.3d 931, 939–40 (8th Cir. 2021) ("RCI's reliance on a $10,000 criminal penalty under Iowa law for fraud is misplaced. The Supreme Court has recognized that criminal penalties are more closely tied to 'the seriousness with which a state views the wrongful action' and are less helpful '[w]hen used to determine the dollar amount of the award." *Dunne v. Res. Converting, LLC*, 991 F.3d 931, 939–40 (8th Cir. 2021) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)).

messaging. *Id.* ¶ 2. The firm admitted "its failure to reasonably supervise its employees." *Id.* ¶ 5. UBS was fined $125 million because its misconduct was a willful violation. *Id.* ¶ 26. The $125 million fine addressed mere risk of harm, without actual harm to specific investors or any finding that key employees deliberately deleted inculpatory messages. The SEC Order addressed the conduct that could harm investors. Here, the harm occurred.

The relevance of the SEC Order is illustrated in *Sanders v. Gardner*, 7 F. Supp. 2d 151 (E.D.N.Y. 1998). The district court confirmed an award of $10 million in punitive damages in arbitration before FINRA's predecessor organization, NASD, based on compensatory damages of approximately $184,000 (54-to-1 ratio). *Id.* at 170. "During the arbitration, the Arbitrators considered evidence of Stratton's ongoing litigation and violation of [an] SEC consent decree." *Id.* at 177. The petitioners in *Sanders* (unlike here) objected to evidence concerning violation of an SEC consent decree during the arbitration hearing. *Sanders*, 7 F. Supp. 2d at 177. Ruling on the motion to vacate, the district court recognized that "securities laws and regulations arose from federal legislation enacted to protect the investing public," and those laws reveal legislative intent to make "harsh sanctions available for potential violations. *Id.* at 178. "Even exorbitant punitive damage awards are not inconsistent with these potential penalties." *Id.* The district court held that the arbitrators properly considered whether the previous SEC consent decree sanctions accomplished their deterrent effect:

> After concluding that the Petitioners were liable to the Claimant, <u>the Arbitrators, in determining the punitive damages award, may have reasonably concluded that the previous sanctions imposed upon Stratton were ineffectual in preventing Petitioners' persistent practices deemed dangerous to the investing public, and that a sizeable award might have a deterrent effect.</u>

*Id.* (emphasis added).

*Sanders* found "ample justification" for the punitive damage award, observing that "the Petitioners' conduct was motivated by greed, avarice and fraud, and the Supreme Court's reluctance to set aside a disproportionate punitive 'damages award reflects the underlying policy considerations of punishment and deterrence." *Id.* at 178-179 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991)). The windfall award stood "as one of life's logical aberrations; a doctrine designed to deter and punish, not compensate, provides at times, the richest compensation of them all." *Id.* at 179. The "Arbitrators' $10,000,000 aggregate punitive damages award was constitutionally sound and supported by the evidence," and it was therefore confirmed. *Id*

Here, by contrast, UBS's arbitration counsel did not object to admission of the Order:

[Counsel for Claimants]: We'd offer Exhibit 45.

[Counsel for Respondents]: No objection.

5/23/23 Hr. Tr. at 97:21-22. They also did not object to any argument concerning the SEC Order. *See* 12/6/23-12/11/23 Hr. Tr. The panel determined that further deterrence was warranted with respect to the Burish Group of UBS. During the hearing (after issuance of the SEC Order), Management employees minimized serious offenses that were the subject of the SEC order (persistently characterizing their "willful" violation as a "gray area"). Stunningly, even after discovery was produced, UBS did not tell its Madison branch manager that Burish sent a prolific volume of business text messages to his clients: "Q. Were you aware that they had text messages between each other that were not just personal but dealt with the Tesla stock? A. Not until I got to Iowa." 11/6/2023 Hr. Tr. at 145:7-10.

Insofar as other FINRA arbitrations bear on comparable civil penalties, as recently as March 12, 2025, a different FINRA arbitration panel awarded almost $80 million in punitive

damages on $26 million in compensatory damages (3-to-1 ratio) for customer claims against a broker including breach of fiduciary duty and fraud. *Janetti v. Stifel, Nicolaus & Co., Inc.*, FINRA No. 23-01342, (March 12, 2025 Award), *available at:* https://www.finra.org/sites/default/files/aao_documents/23-01342.pdf; *see also Deluca v. Stifel, Nicolaus & Co., Inc.*, FINRA Case No. 23-01288 (October 3, 2024 Award) (awarding claimants $9 million in punitive damages and compensatory damages totaling $4,065,346, for customer investments in structured notes with Stifel broker Chuck Roberts), *available at:* https://www.finra.org/sites/default/files/aao_documents/23-01288.pdf.

**V.    The Arbitration Panel Need Not Have Found Conduct was Specifically Directed Claimants (as Courts and Juries Must), but it Did So.**

UBS's request to vacate under Iowa Code § 668A.1(1)(B) fails for a cascade of standalone reasons, detailed in each section below.

**A.    Iowa Code § 668A.1(1)(b)'s Specific Direction Requirement Does Not Apply to Arbitrators, Per the Statutory Text.**

Claimants presented Iowa Code § 668A.1 to the arbitration panel because it contains an illustrative punitive damage standard with proof of willful and wanton disregard for the rights of another. For the first time in its Motion to Vacate, Respondents cite a different subsection, Iowa Code § 668A.1(1)(b), that they failed to cite or argue to the panel (thus waived). It addresses whether conduct was "specifically directed at the claimant" in order to determine how to allocate the punitive damage award in courts of law within Iowa. In doing so, Respondents ignore that that this statute imposes this obligation only on a "court" during a "trial" presiding over a "jury" or acting as factfinder, none of which apply in private contractual arbitration under federal law:

In a <u>trial</u> of a claim involving the request for punitive or exemplary damages, <u>the court</u> shall instruct the <u>jury</u> to answer special interrogatories or, if there is no jury, shall make findings, indicating all of the following:

> a. Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.

> b. Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived.

Iowa Code § 668A.1(1) (emphasis added). Per its text, Iowa Code § 668A.1(1)(b) does not extend to disputes that parties contracted to arbitrate under the FAA.

## B.    The Panel Found that the Conduct was Specifically Directed at Claimants.

Petitioners are incorrect that the Panel made no finding that the conduct was specifically directed at Claimants because the panel explicitly considered Iowa Code § 668A.1 in each punitive damage award and allocated 100% of punitive damages to Claimants "[a]fter considering the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions." Doc. 1-14 at 4, Award; *id.* at 5 (citing Iowa Code § 668A.1). Having expressly considered section 668A.1 in relation to the full record, the panel fully addressed Iowa law on punitive damages, and nothing indicates it did not. *See id.*

Respondents' objection that the FINRA arbitrator guide indicates that the panel "should"[11] include the basis for awarding punitive damages is confounding insofar as the panel did exactly this. Doc. 1-1 at 25 (p. 20) (citing Doc. 1-12 at 70, FINRA Arbitrator's Guide) (authorizing award of punitive damages). "FINRA rules do not require an arbitrator to make findings of fact unless both parties request it in advance." *Principal Sec.*, 17 N.W.3d

---

[11] Beyond having specifically cited the statutory and case law basis in the Award, the suggestion that the panel "should" include the basis is not a mandate. The FINRA Arbitrator Guide does not state that they "shall" or "must"—mandates that appear elsewhere throughout the guide but not here. *See generally* Doc 1-12, FINRA Arbitrator Guide.

at 114 n.4; *see also Munizzi*, 202 N.E.3d at 368 ("The arbitrators' statement in this case that the punitive damages were awarded 'pursuant to *Republic Tobacco*' reflects the arbitrators' understanding that punitive damages are available when there is proof of actual malice and defeats UBS's argument that the arbitrators failed to find such proof in the case before them.").

In any event, "[t]o facilitate this intended quick, efficient, and informal means of private dispute settlement, it has long been established that arbitrators are not required to disclose the basis or reasoning upon which their awards are made." *Sanders v. Gardner*, 7 F. Supp. 2d 151, 158–59 (E.D.N.Y. 1998) (citing *Atkinson v. Sinclair Refining Co.,* 370 U.S. 238 (1962)). "A court, therefore, need only infer from the facts of the case the grounds for the arbitrator's decision, even where tenuous at best." *Id.*; *see also Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 841 (Iowa 2007) (quoting *Humphreys v. Joe Johnston L. Firm, P.C.*, 491 N.W.2d 513, 514 (Iowa 1992)) ("On our limited review, 'every reasonable presumption will be indulged in favor of the legality of an arbitration award.'"); *Lee*, 983 F.2d at 888 ("[T]here is nothing on the record that indicates that the arbitrators did not address the substantive law of Minnesota in awarding punitive damages."); *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 932 F.3d 1, 11 (1st Cir. 2019) ("[T]he arbitrator is presumed to have based his or her award on proper grounds").

The bargained-for efficiency of arbitration means that an arbitrator's alleged disregard of the law is not a valid basis to set aside an award. *Med. Shoppe Int'l*, 614 F.3d at 489 ("Appellants' claims, including the claim that the arbitrator disregarded the law, are not included among those specifically enumerated in § 10 and are therefore not cognizable."); *Principal Sec.*, 17 N.W.3d at 112 (quoting Iowa Code § 679A.12(2)) ("The fact that the relief

awarded could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award."); *Munizzi*, 202 N.E.3d at 368.

**C.   FINRA Rules Authorizing Punitive Damages Incorporated by Reference into the Arbitration Agreement Supersede State Law Under the FAA.**

Even if this court somehow concluded the arbitration panel did not find conduct specifically directed at Claimants, it is long established that "the FAA gives force to the rules of the" arbitration forum over any contrary state law. *Lee*, 983 F.2d at 888. Because FINRA rules authorize the panel to award punitive damages, the FAA gives effect to the punitive damage award even if it were contrary to state law. *See Sanders*, 7 F. Supp. 2d at 172 (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52 (1995)).

In *Mastrobuono*, New York law foreclosed the award of punitive in arbitration altogether. Nonetheless, the arbitrator's manual of FINRA predecessor organization, NASD, permitted arbitrators to consider punitive damages as a remedy. *Id.* This "led the Court to conclude that the arbitration clause contradicts the conclusion that the parties agreed to foreclose claims for punitive damages." *Sanders* denied a motion to vacate and confirmed a $10 million punitive damage award, at a 54-to-1 ratio to compensatory damages. *Id.* at 180.

UBS's arbitration agreement specifically incorporated FINRA's rules and, consistent with them, stated that "[t]he arbitrators do not have to explain the reason(s) for their award, unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date." *See, e.g.,* Doc. 1-20 at 26; *see also* Doc. 1-10 at 99, FINRA Rule 12904(g)(2) ("An explained decision is a fact-based award stating the general reason(s) for the arbitrators' decision. Inclusion of legal authorities and damage calculations is not required."); Doc. 1-10 at 99, FINRA Rule 12904(g)(3) ("Parties must make any request for an explained decision no later than the time

for the prehearing exchange of documents and witness lists under Rule 12514(d)," which is 20 days prior to the hearing). UBS failed to request an explained decision. "Upon a party's request, arbitrators may consider punitive damages as a remedy if a respondent has engaged in serious misconduct that meets the standards for such an award." Doc. 1-12 at 70, FINRA Arbitrators' Guide. The award is consistent with the arbitration agreement and is binding.

### D.    Fraudulent Non-Disclosure and the Breaches of Fiduciary Duty Here were Uniquely Directed at Claimants, to Whom those Duties were Owed.

Respondents' actions were necessarily specifically directed at Claimants. Claimants established, and the Arbitration Panel found, that UBS committed intentional torts, including fraudulent non-disclosure and breach of fiduciary duty. For instance, UBS and Burish fraudulently omitted disclosure that Burish was no longer personally betting against Tesla stock as Burish continued to recommended Claimants take and hold short positions in Tesla. *See* 5/18/2023 Hr. Tr. pp. 259:4-260:4; 5/15/2023 Hr. Tr. pp. 145-146; 5/17/2023 Hr. Tr. pp. 186-187; 5/19/2023 Hr. Tr. pp. 189-190; 5/20/2023 Hr. Tr. p. 215. Fraudulent non-disclosure depends on fiduciary duty requiring disclosure of information to the specific individual to whom that duty is owed. *Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984). Moreover, Respondents also breached fiduciary duties by specifically communicating to Claimants prohibited price and performance predictions. *See, e.g.,* Ex. 40, 41 (voicemails illustrating phone calls); Ex. 34-38 (texts); Ex. 89-93 (articles); Ex. 88 (call summary). These were not mass communications, but targeted messages and calls necessarily specifically to Claimants. *See id.*

### E.    The Arbitration Contract Did Not Require Application of § 668A.1(1)(b).

Finally, Respondents' argument also fails for the standalone reason that the arbitration contracts do not call for the parties to apply Iowa law (let alone, Iowa Code § 668A.1(1)(b)),

and it instead provided that the arbitration "shall be governed by the Federal Arbitration Act" and FINRA rules. Doc. 1-11 at 30-31, Doc. 1-15 at 10; Doc. 1-16 at 20; Doc. 1-17 at 24-25; Doc. 1-18 at 23-24; Doc. 1-19 at 31-32; Doc. 1-20 at 26-27. Claimants merely cited Iowa law to illustrate a punitive damage standard without objection. *See* Iowa Code § 668A.1(1)(a) (requiring proof of willful and wanton disregard for the rights of another).

## VI.    Claimants Request that this Court Confirm the Award and Shift Fees.

Claimants request confirmation of the Award pursuant to 9 U.S.C. § 9. Claimants request judgment set forth in the Award plus interest at a rate of 6.13% from February 28, 2025, until the date paid. *See*. Doc. 1-10 at 100, FINRA Rule 12904(j) ("An award shall bear interest from the date of the award . . . [i]f the award is the subject of a motion to vacate which is denied . . . at the legal rate, if any then prevail in the state where the award was rendered"); Iowa Code §§ 535.3(1), 668.13; Decl. of Nicholas Petersen; Defendants' Ex. E.

Defendants further request their attorneys' fees and costs because Plaintiffs' central objections—alleged excessiveness of the punitive damage ratio and Iowa Code § 668A.1(1)(b)—are arguments they had fair opportunity to raise to the panel, failed to do so, and therefore know they forfeited. *See* Defendants' Ex. D at 8 (UBS: "The failure to pose an available argument to the arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award."). Fees are proper in these circumstances. *See Glass-Inspiration GMBH*, No. 24-CV-3315, 2025 WL 303946, at *4 (quoting *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. United Farm Tools, Inc.*, 762 F.2d 76, 77 (8th Cir. 1985)) ("An unjustified refusal to abide by an arbitrator's award may constitute bad faith for the purpose of awarding attorneys' fees."); *see also Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 903 (7th Cir. 2017) (Easterbrook, J.) ("[C]ommercial parties

that have agreed to final resolution by an arbitrator, yet go right on litigating, must pay their

adversaries' attorneys' fees."); *PaineWebber Inc. v. Farnam*, 843 F.2d 1050, 1052–53 (7th Cir.

1988) (ordering UBS predecessor PaineWebber to pay attorneys' fees: "[a]rbitration is neither

quick nor cheap when one party litigates to the gills"). Claimants request an opportunity to

submit a Fed. R. Civ. P. 54 motion detailing Defendants' reasonable fees and costs.

## VII.    Conclusion

WHEREFORE Defendants respectfully request that this Court enter an Order:

(a) Denying Plaintiffs' Motion to Vacate;

(b) Granting Defendants' Motion to Confirm the Award;

(c) Entering judgment in favor of the Hansen Family and Kramer and against Plaintiffs

UBS Financial Services, Inc., ("UBS") and Andrew Burish ("Burish), as follows:

> (i) $68,133,438.00 against UBS and $1,992,595.50 against Burish plus post judgment interest at a rate of 6.13% from February 28, 2025, until the date paid in favor of Dennis and Leslie Hansen;

> (ii) $3,171,484.80 against UBS and $188,096.80 against Burish plus post judgment interest at a rate of 6.13% from February 28, 2025, until the date paid in favor of Tyler and Noelle Hansen;

> (iii) $1,076,256.00 against UBS and $129,896.00 against Burish plus post judgment interest at a rate of 6.13% from February 28, 2025, until the date paid in favor of Jordan and Bradley Nelson;

> (iv) $3,204,864.00 against UBS and $189,024.00 against Burish plus post judgment interest at a rate of 6.13% from February 28, 2025, until the date paid in favor of Lindsey and Nicholas Valentini;

> (v) $16,652,044.80 against UBS and $562,556.80 against Burish plus post judgment interest at a rate of 6.13% from February 28, 2025, until the date paid in favor of Mark Kramer;

(d) Awarding Defendants their attorneys' fees and costs and offering the opportunity

to submit a motion pursuant to Fed. R. Civ. P. 54 detailing reasonable fees and costs.

(e) Granting all other relief that is fair and just.

Dated: June 3, 2025

SIMMONS PERRINE MOYER BERGMAN PLC

By: /s/ Stephen J. Holtman
Stephen J. Holtman, AT0003594
Paul D. Gamez AT0002806
Nicholas Petersen AT0012570
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
Telephone: (319) 366-7641
Facsimile: (319) 366-1917
Email: sholtman@spmblaw.com
        pgamez@spmblaw.com
        npetersen@spmblaw.com

ATTORNEYS FOR DEFENDANTS DENNIS
HANSEN, LESLIE HANSEN, TYLER
HANSEN, NOELLE HANSEN, BRADLEY
NELSON, JORDAN NELSON, LINDSEY
VALENTINI, NICHOLAS VALENTINI, AND
MARK KRAMER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 3, 2025, a copy of the foregoing document was filed with the Clerk of Court for the United States Court for the Southern District of Iowa using the CM/ECF system which will send notification of such filing to all attorneys and parties of record.

/s/ Stephen J. Holtman