IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UBS FINANCIAL SERVICES INC., and ANDREW BURISH, | ) ) ) | Case No. 4:25-cv-00120-SMR-HCA |
| Petitioners, | ) ) ) | ORDER ON MOTION TO VACATE ARBITRATION AWARD |
| v. | ) ) | |
| DENNIS HANSEN, LESLIE HANSEN, TYLER HANSEN, NOELLE HANSEN, BRADLEY NELSON, JORDAN NELSON, LINDSEY VALENTINI, NICHOLAS VALENTINI, and MARK KRAMER, | ) ) ) ) ) ) | |
| Respondents. | ) | |

Petitioners UBS Financial Services ("UBS") and Andrew Burish move to vacate an arbitration award in favor of Respondents ("Claimants") under 9 U.S.C. § 10(a)(4). [ECF No. 1]. The arbitration panel found UBS liable for over $23 million in compensatory damages and $69 million in punitive damages, and found Burish liable for over $2.5 million in compensatory damages and $500,000 in punitive damages. *Id.* ¶ 16. Claimants move to confirm the award. [ECF No. 25]. For the reasons that follow, Petitioners' motion is DENIED. [ECF No. 1]. Claimants' motion is GRANTED in part. [ECF No. 25].

I.    BACKGROUND[1]

Burish has been a financial advisor at UBS since 1984. [ECF No. 1-2 ¶¶ 14–15]. He is a self-identified "risk taker" who built a successful practice managing $3.8 billion in client assets.

---

[1] Petitioners rely on the facts as presented by Claimants because their motion "does not turn on any disagreement about the underlying evidentiary record." [ECF No. 1-1 at 7–8]; *cf. Entergy Operations, Inc. v. United Gov. Sec. Officers of Am. Int'l*, 856 F.3d 561, 564 (8th Cir. 2017) ("We accept the facts as found by the arbitrator . . . ."). The Court does the same, but notes that the arbitration panel did not provide any written findings of fact.

[ECF No. 1-3 at 5–6]. Claimants were his clients. Dennis and Leslie Hansen opened their account in 2008, and the remaining Claimants, except Mark Kramer, are members of their family. [ECF No. 1-2 ¶¶ 35, 39, 43]. All considered themselves "retail investors." [ECF No. 1-1 at 8].

UBS's Client Relationship Agreement contains an arbitration clause. *See, e.g.*, [ECF Nos. 1-16 at 20; 1-18 at 24]. Under it, the parties forfeited "the right to sue each other in court . . . except as provided by the rules of the arbitration forum in which a claim is filed," and acknowledged that judicial review of "an arbitration award is very limited." *Id.* Multiple iterations of Dennis and Leslie's agreement reinforced the point: "[t]he parties are waiving their right to seek remedies in court" and "[t]he award of the arbitrators, or of the majority of them, shall be final, and judgment upon the award rendered may be entered in any court of competent jurisdiction." [ECF Nos. 1-15 at 10; 1-16 at 20].

The arbitration clause in each of the agreements also established certain procedural mechanisms governing arbitration. Two agreements stated that the panel was not required "to explain the reason(s) for their award," and that the award was "not required to include factual findings or legal reasoning." [ECF Nos. 1-15 at 10; 1-16 at 20]. Other agreements noted that "arbitrators do not have to explain the reason(s) for their award" unless requested to do so by the parties. [ECF Nos. 1-17 at 24; 1-18 at 24]; *see also* FINRA Rule 12904(g). These agreements also stated that "arbitrators shall resolve any controversy in accordance with applicable law." [ECF Nos. 1-17 at 25; 1-18 at 24].

In 2017, Burish began recommending that Claimants "short sell" shares of Tesla stock. [ECF No. 1-2 ¶ 20]. He was the only advisor in his office that recommended this strategy to clients. [ECF No. 1-3 at 12]. Short selling is a high-risk, high-reward strategy where an investor sells stock they do not own, expecting to repurchase the borrowed shares at a lower price in the

future.  [ECF No. 1-2 ¶¶ 20, 21].  If the stock's price increases, the investor can suffer significant losses exceeding their principal investment.  [ECF No. 1-1 at 8].  That occurred here; Tesla's stock rose sharply after Claimants took their short positions, costing them tens of millions of dollars by the time they closed.  *Id.*

Claimants submitted their grievances to a FINRA arbitration panel, asserting claims against Petitioners for breach of fiduciary duty, violation of FINRA suitability rules, failure to supervise/negligent supervision, and fraudulent nondisclosure.  [ECF No. 1-2 ¶¶ 64–97].  They sought compensatory and punitive damages, costs, interest, and attorney's fees.  *Id.*  Petitioners denied the allegations and sought dismissal with prejudice.  [ECF No. 1-14 at 3].

The panel conducted 39 days of hearings, during which Claimants presented substantial evidence that Petitioners' actions contravened UBS guidance, FINRA rules, and common law duties.  The parties did not request an explained decision from the panel.  *See id*. at 3–9.  The Court therefore cannot restate the panel's findings with certainty, but highlights the evidence most relevant to the issues presented.

Claimants alleged that Burish impermissibly called and texted them, "promoting a one-sided view that Tesla stock was overvalued, and urging Claimants to maintain their short positions despite mounting losses."  [ECF No. 1-1 at 8].  Between June 2017 and July 2020, Burish made 878 phone calls, left voicemails with price predictions, and sent 885 private text messages to Claimants.  [ECF No. 1-3 at 19].  Almost half of those communications occurred after September 27, 2019, a critical period during which Claimants suffered their most significant losses, and a substantial number violated UBS policy and FINRA rules.  *Id.* at 19, 27, 30.

Burish was adamant that Tesla was overvalued, and continued to recommend an expansion of Claimants' short position despite their mounting concerns about the stock's price and volatility.

*See, e.g.*, [ECF No. 1-2 ¶¶ 23, 26, 28, 29]. For example, Claimants had taken their positions when Tesla traded between $240 and $480 per share, with most falling within the $200–$300 range. [ECF No. 1-9 at 93]. The subsequent price trajectory tells the story. On March 2, 2020, with Tesla trading at $743.63, Burish mailed Claimants an article written by undergraduate students predicting Tesla's bankruptcy. [ECF No. 1-3 at 48]. On March 15, with the stock at $546.62, he texted, "Tesla below 300 I hope." *Id.* Three days later, when the price had dipped to $361.22, Burish recommended that Claimants continue to hold their short position. *Id.* The stock price subsequently skyrocketed, reaching $524.00 per share by March 31 and $1,546.01 per share by July 15. [ECF No. 1-2 ¶ 54].

Even as the stock price had nearly doubled since Claimants' entry point, Burish assuaged their concerns by continuing to reaffirm his belief that a significant price drop was coming and that they did not need to cover their short position. *Id*. ¶¶ 27, 28, 31. He reiterated this position even when Tesla's price dipped substantially. *Id.* ¶ 31. What Burish did not tell Claimants was that his view was a minority position in the industry. [ECF No. 1-3 at 22]. Every Claimant made similar allegations that Burish repeatedly assured them that a drop was coming, at times describing his messaging as "nonstop." [ECF No. 1-2 ¶¶ 35, 37, 39, 41, 43–45, 47–51]; *see also* [ECF No. 1-3 at 29–30].

Burish also allegedly made misleading entries in the UBS customer relationship management tool and told Claimants that UBS had not changed its position on Tesla. [ECF No. 1-3 at 28–29]. That was not accurate. On January 22, 2020, UBS substantially improved its view on Tesla; raising its 12-month price target from $160 to $410. *Id.* at 32. UBS also abandoned its negative rating of the stock—a signal that the firm considered Tesla fairly valued. *Id.* Burish did not inform Claimants of these developments or that his short-selling advice conflicted with UBS's

outlook. *Id.* at 31. His colleagues were less restrained. In private conversations, some expressed their surprise at the advice Burish had given. *See, e.g.*, *id.* at 48 ("Yikes on Hansen, i can't believe he didn't close those guys out when he had the chance."); [ECF No. 1-9 at 26] ("Oh, I thought Andy did tell them to cover it. Yikes, I did not know that.").

Claimants also presented evidence that short selling was never a suitable strategy for their "moderate risk" accounts. [ECF No. 1-2 ¶ 18]. Under UBS policy, "moderate risk" accounts only permit "some risk to principal and tolerate some volatility." [ECF No. 1-16 at 8]. Short selling, however, exposes investors to losses far exceeding their principal. [ECF No. 1-3 at 25]. That risk materialized here. *Id.* Although UBS had short selling policies, there is no evidence Burish shared them with Claimants. *Id.* at 16–17. Multiple experts testified that short selling was not suitable for any Claimant, including one expert who concluded that it "was not a close call" given the substantial position Burish allowed Claimants to take and the fact that Tesla was "the single most volatile stock in the U.S. stock market." *Id.* at 16.

Claimants alleged that Burish's conduct violated several FINRA rules: prohibitions on one-sided analysis, requirements of balanced treatment of risk and potential benefit, restrictions on predicting or projecting performance, and the obligation not to omit material facts. *See id.* at 25–28, 31. He also allegedly violated UBS's outright prohibition on text messaging with clients. *Id.* at 34.

Additionally, Claimants accused Burish of falsely implying that he held a Tesla short position alongside them—for himself and his daughter. *Id.* at 38. UBS's own expert admitted this was improper. *Id.* at 39. Burish had in fact held short positions in his personal account between 2013 and 2019, but he closed them in July 2019. *Id.*; *see also* [ECF No. 1-2 ¶¶ 59–61]. He did not inform Claimants that he closed his position, and he continued to imply that he was shorting

Tesla and recommend that Claimants hold their position because the price would drop. [ECF Nos. 1-2 ¶¶ 59–62; 1-3 at 39].

Next, Claimants alleged that Burish intentionally deleted communications to create an incomplete and misleading record of his investment advice. [ECF No. 1-1 at 8]. Burish maintained that he deleted all communications from his phone because his daughter was "snooping" into his personal life. Claimants, in contrast, argued this was an intentional act to conceal his prohibited and misleading communications. [ECF No. 1-3 at 8–9]. Claimants contend that UBS took no action against Burish when it later learned of these improper communications. *Id.* at 6.

Claimants also presented evidence that UBS failed to supervise Burish despite warning signs. [ECF No. 1-1 at 9]. They argued that Burish's communications violated industry standards and, if UBS had properly supervised him in accordance with industry rules, it could have corrected his behavior before Claimants were substantially harmed. [ECF No. 1-3 at 7]. A UBS branch manager admitted Burish's texts were not reasonably supervised, and no supervisor ever questioned Burish about his communication with Claimants. *Id.* at 37–38. UBS knew, however, that Burish sent Claimants at least one improper article about Tesla's stock price, but did not notify Claimants that this was inappropriate. *Id.* at 36. Despite conducting daily reviews of Tesla short-selling activity, UBS never questioned whether the strategy was suitable for Claimants' accounts. *Id.* at 23, 36. And when the Tesla position exposed assets held outside Claimants' UBS accounts, supervisors attempted to retroactively update one account's risk profile to justify the strategy after the fact. *Id.* at 25.

Claimants argued that these supervision failures took on a special significance in light of a September 2022 SEC settlement. [ECF No. 1-1 at 9]. In that settlement, UBS admitted to violating the Exchange Act by failing to retain "off-channel communications" sent by its employees—a

firm-wide failure involving employees at all levels of authority—and by failing to "implement its policies and procedures that prohibit such communications." *Id*. As a result, UBS agreed to pay a $125 million civil penalty. *Id.* Claimants acknowledged the settlement postdated Burish's misconduct but argued it demonstrated that prior penalties had been "apparently insufficient deterrence." [ECF No. 1-3 at 46].

Claimants also described Petitioners' conduct at the arbitration proceedings as a "concede nothing" approach where, despite the SEC settlement, they argued that no duties were breached and sought to have the record expunged. *Id*. at 7; *see also* [ECF No. 1-5 at 59] ("We concede nothing in terms of our position in presenting our defense."). Claimants cited a specific example where Petitioners claimed that texting clients was a "gray area" and suggested that a UBS supervisor authorized Burish to do so. [ECF No. 1-3 at 50]. When Claimants called that supervisor as a rebuttal witness, he testified that texting clients was absolutely forbidden. *Id.*

As a consequence for Petitioners' alleged misconduct, Claimants sought punitive damages, citing Iowa Code § 668A.1 in support of their argument. Under that statute, punitive damages are permitted if the conduct "constituted willful and wanton disregard for the rights or safety of another." *Id.* § 668A.1(1)(*a*). Claimants acknowledged that punitive damages "are allowed to punish and discourage the defendant and others from like conduct in the future," but are not "intended to compensate for injury." [ECF No. 1-3 at 45].

Claimants argued that punitive damages were warranted by an accumulation of Petitioners' egregious behavior: improper sales techniques, deletion of evidence, prohibited communications, withholding of material information, presentation of grossly unbalanced views, deliberate breaches of investor-protection standards, and "concede nothing" defense despite admitting to numerous failures in the SEC settlement, all resulting in substantial financial harm. *Id.* at 45–51. Their post-

hearing briefing focused on: (1) destruction of customer records, "precisely why the SEC fined UBS $125 million;" (2) Burish's deletion of hundreds of prohibited communications; (3) efforts to conceal the misconduct; (4) Burish's advancement of an extreme minority view without informing Claimants and withholding of material information; (5) UBS's failure to supervise Burish and protect its clients; and (6) Petitioners' "concede nothing" posture throughout. *Id.* at 46–49. Claimants requested a multiplier of one to four times the compensatory damages award, arguing that the "upper end" of the range was "warranted." *Id.* at 51.

The panel awarded Claimants compensatory and punitive damages but declined to award attorney's fees. [ECF No. 1-14 at 4–6]. UBS was found liable for $23,059,521.90 in compensatory damages and $69,178,565.70 in punitive damages; Burish was ordered to pay $2,562,169.10 in compensatory damages and $500,000 in punitive damages. [ECF No. 1-1 at 11–12]. The panel cited Iowa Code § 668A.1, Iowa Civil Jury Instructions June 2024 210.1, and *McGough v. Gabus*, 526 N.W.2d 328, 334 (Iowa 1995), as authority for the punitive awards. [ECF No. 1-14 at 5–6].

Petitioners promptly moved to vacate the award. [ECF No. 1]. UBS argues that the panel exceeded its power by imposing a grossly excessive punitive damages award; UBS and Burish both argue that vacatur is independently warranted by the panel's failure to comply with Iowa Code § 668A.1. *Id.* ¶¶ 28–41. They invoke 9 U.S.C. §§ 10(a)(4) and 11 in support of their motion to vacate or, alternatively, modify the punitive damages award. *Id.* ¶¶ 32, 41. Claimants resist and seek confirmation of the arbitration award under 9 U.S.C. § 9, along with post-judgment interest, costs, and attorney's fees. [ECF Nos. 23, 25].

## II.    LEGAL STANDARDS

The Federal Arbitration Act ("FAA") "establishes a liberal federal policy favoring arbitration agreements." *Duncan v. Int'l Mkts. Live, Inc.*, 20 F.4th 400, 402 (8th Cir. 2021)

(citation omitted).  Consistent with that policy, a court's "scope of review of the arbitration award itself is among the narrowest known to the law."  *Meridian Med. Techs., Inc. v. Int'l Bhd. of Teamsters*, 158 F.4th 924, 929 (8th Cir. 2025) (citation omitted).  Courts may not reconsider the merits of an arbitration award.  *Med. Shoppe Int'l, Inc. v. Turner Invs., Inc.*, 614 F.3d 485, 488 (8th Cir. 2010).  And a "refusal to enforce an award must rest on more than speculation or assumption."  *Meridian Med.*, 158 F.4th at 932 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 44 (1987)).  Courts must accept the facts as found by the arbitration panel but may review legal conclusions *de novo*.  *Entergy Operations*, 856 F.3d at 564.

The FAA permits vacatur of an arbitration award in only four limited circumstances.  *See* 9 U.S.C. § 10(a).  As relevant here, a court may vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  *Id.* § 10(a)(4).  Modification is similarly only available in very limited circumstances.  *See id.* § 11.  Sections 10 and 11 provide the exclusive grounds for vacatur or modification.  *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).  If no statutory ground for modification or vacatur applies, an award must be confirmed.  *Id.* at 582.

A party arguing that an arbitration panel exceeded its authority "bears a heavy burden."  *Entergy Operations*, 856 F.3d at 566.  "An arbitrator does not exceed his powers by making an error of law or fact, even a serious one."  *Indus. Steel Constr., Inc. v. Lunda Constr. Co.*, 33 F.4th 1038, 1041 (8th Cir. 2022) (citation omitted).  So long as an arbitrator is "arguably construing or applying the contract and acting within the scope of his authority," courts may not set the award aside.  *Meridian Med.*, 158 F.4th at 929 (quoting *Misco,* 484 U.S. at 44).  The question is whether the panel arguably interpreted the parties' contract, not whether it interpreted it correctly.  *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).

An arbitration award is also unenforceable if it violates public policy. *See Misco*, 484 U.S. at 42–43; *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995). That exception, however, is incredibly narrow. *WM Crittenden Operations, LLC v. United Food & Com. Workers, Loc. Union 1529*, 9 F.4th 732, 736 (8th Cir. 2021). The identified public policy "must be well defined and dominant." *Meridian Med.*, 158 F.4th at 931 (quoting *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum, & Plastic Workers*, 461 U.S. 757, 766 (1983)). It must be established by existing law; not merely derived "from general considerations of supposed public interests." *Id.* (quoting *Misco*, 484 U.S. at 44). This is most clearly seen when the law imposes "specific and exacting requirements" defining the public policy at issue. *MidAm. Energy Co. v. Int'l Bhd. of Elec. Workers*, 345 F.3d 616, 621 (8th Cir. 2003).

## III.   ANALYSIS

Petitioners advance two grounds for vacatur under 9 U.S.C. § 10(a)(4): (1) the punitive damages award is grossly excessive in violation of well-defined federal and Iowa public policy, and (2) the award fails to satisfy the requirements of Iowa Code § 668A.1. *See* [ECF No. 1-1 at 12, 22]. Alternatively, Petitioners request the Court modify the award to "a constitutionally permissible amount," specifically, a 1:1 ratio with the compensatory damages. *Id.* at 21, 25.

Claimants respond that the award is not reviewable at all, contending that Petitioners waived their challenges by failing to raise them to the arbitration panel. [ECF No. 23 at 5]. However, even if the award is reviewable, Claimants argue that the punitive damages are consistent with the arbitration agreement, Petitioners' public policy objections fail on the merits, and the award was fully justified. *Id.* at 8, 12.

The Court begins with the waiver question. The Eighth Circuit has explicitly held that a party does not waive "its right to challenge the [arbitration] award on public policy grounds by not

-10-

raising this issue to the arbitrator." *Boehringer Ingelheim Vetmedica, Inc. v. United Food & Comm. Workers*, 739 F.3d 1136, 1142 (8th Cir. 2014). The court has reached the merits of such arguments in similar circumstances. *Id.*; *see also Iowa Elec. Light & Power Co. v. Loc. Union 204*, 834 F.2d 1424 (8th Cir. 1987); *MidAm. Energy Co.*, 345 F.3d 616. Thus, although parties are not required to raise a public policy argument to the arbitrator, failing to do so presents practical issues which "will likely be fatal." *Boehringer*, 739 F.3d at 1142.

This is especially true where, as here, Petitioners raise several arguments to support their public policy objection that they did not advance during the arbitration proceedings. For example, Petitioners do not identify any objection they raised regarding the SEC settlement during the arbitration proceedings, nor did their post-hearing briefing suggest that consideration of the settlement would be improper. *See* [ECF No. 1-13]. Rather, they argued that punitive damages were "inappropriate for two independent, equally dispositive reasons." *Id.* at 54. The first reason was that Claimants "presented no evidence that the decisions they made bore any relevance to the investing public." *Id.* The second was that Claimants "presented no evidence that Mr. Burish acted with the degree of malice required for a showing of 'high moral culpability'" or that they had "failed to meet their burden in establishing wrongdoing on the part of UBS through its supervision of Mr. Burish." *Id.* at 55. Neither argument implicates the SEC settlement objection they now raise.

Similarly, Petitioners never raised any argument regarding Iowa Code § 668A.1 to the arbitration panel. The Court will reach the merits of both contentions, but these omissions may well forfeit them. *See Boehringer*, 739 F.3d at 1140 ("In general, federal courts do not permit a party to withhold an issue or argument during arbitration and then, upon losing, raise it to the reviewing court.").

One further threshold matter requires correction. Claimants' frame the issue as whether there is any "public policy favoring yearslong, intentional breaches of professional duties of care against trusting clients." [ECF No. 23 at 8]. That is incorrect. The Court's task is to determine whether the arbitration panel's *decision* violates public policy—not whether Petitioners' underlying *conduct* violated public policy. *Meridian Med.*, 158 F.4th at 931; *see also PaineWebber*, 49 F.3d at 350. Eighth Circuit precedent recognizes the viability of a public policy challenge to an arbitration award, and the Court is bound by it. *See, e.g.*, *Meridian Med.*, 158 F.4th at 931.

### A. Grossly Excessive in Violation of Public Policy

The Court now turns to the merits. UBS attempts to merge two distinct legal theories. It cites cases in which courts considered public policy challenges to arbitration awards, and it cites cases in which courts vacated or modified punitive damages awards, but it fails to mesh the two. UBS identifies no case in which a court vacated or modified an arbitration award for punitive damages on public policy grounds. *See* 9 U.S.C. § 10(a)(4). As far as the Court is aware, this is a novel argument in the Eighth Circuit.

There is good reason for that. When a district court awards punitive damages, state action is present which necessarily implicates the Due Process Clause. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996); *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408, 416–17 (2003). The same is not true when private parties contract to settle a dispute through arbitration.

UBS recognizes this distinction. It is not raising a due process challenge, it contends, it is only arguing that the panel exceeded its authority by violating a well-defined and dominant public policy against excessive punitive damages established by the Due Process Clause. [ECF No. 34 at 12] ("UBS does not argue that the arbitral award violated the Due Process Clause . . . ."). The

theory runs as follows: "the Due Process Clause imposes substantive limits on a State's power to impose penalties on a defendant through punitive damages," and a grossly excessive award serves "no legitimate purpose and constitutes an arbitrary deprivation of property" because it leaves defendants without "fair notice . . . of the penalty that a State may impose." [ECF No. 1-1 at 13–14] (quoting *Campbell*, 538 U.S. at 417).

UBS asserts a repackaged due process challenge premised on an illusory distinction. In effect, it asks the Court to find that the panel's punitive damage award offends due process without actually raising a due process claim; likely because it does not apply in this setting. *See Stark v. Sandberg, Phoenix & von Gontard, P.C.*, 381 F.3d 793, 803 (8th Cir. 2004); *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1191 (11th Cir. 1995) ("[W]e agree with the numerous courts that have held that the state action element of a due process claim is absent in private arbitration cases."). As the Eleventh Circuit observed, "[t]o decide otherwise would constitutionalize private arbitration proceedings and diminish both the effectiveness and the appeal of the arbitral forum as an alternative means for resolving dispute." *Davis*, 59 F.3d at 1193–94. The label UBS chose does not change the analysis. Whether UBS invokes due process directly or a public policy derived from the Due Process Clause, the argument and desired result are the same.

If the Court accepted UBS's argument, it would open the courthouse doors to every losing party following an arbitration award of punitive damages. Moreover, it would effectively permit litigants to end-run the prohibition on judicial reconsideration of the merits of an arbitration award. *See Med. Shoppe Int'l*, 614 F.3d at 488. The Court cannot reach such a conclusion. *See Hall Street*, 552 U.S. at 588 (rejecting a statutory reading that "opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process'") (citation omitted).

Certainly, there is a public policy against constitutional violations.  But UBS does not assert a constitutional challenge.  [ECF No. 34 at 12].  And as it acknowledges, countervailing public policies favor arbitration and the award of punitive damages as deterrence and retribution.  [ECF No. 1-1 at 13] (citing *Campbell*, 538 U.S. at 416–17; *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 865 (Iowa 1994)).  Vacating the punitive damages award on this ground would require the Court to impermissibly consider the merits of the arbitration award.  *Med. Shoppe Int'l*, 614 F.3d at 488.  This is especially true given that UBS does not contest whether the panel was authorized to award punitive damages in the first place.

UBS's Iowa public policy argument fares no better, and it is difficult to see how it differs from the federal public policy argument.  UBS does not clearly articulate any independent public policy under Iowa law.  Rather, it relies heavily on the same principle underlying its federal argument—that excessive punitive damages awards inherently offend due process—and cites Iowa authorities in support of that conclusion.  [ECF No. 1-1 at 13–15].

Nonetheless, even if UBS identified an applicable state or federal public policy, it has not shown that public policy to be "well defined and dominant."  *Meridian Med.*, 158 F.4th at 931 (quoting *W.R. Grace & Co.*, 461 U.S. at 766).  The Eighth Circuit has repeatedly emphasized that the clearest demonstration of such a policy is the existence of "specific and exacting requirements" in positive law.  *See, e.g.*, *id.* at 931; *Boehringer*, 739 F.3d at 1142; *MidAm. Energy*, 345 F.3d at 621.  The policy must be "ascertained by reference to positive law and not from general considerations of supposed public interests."  *MidAm. Energy*, 345 F.3d at 620 (quoting *E. Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62–63 (2000)).  UBS's reliance on *Campbell* illustrates the problem.

*Campbell* instructs courts to evaluate punitive damages awards imposed by a jury against three malleable "guideposts:" (1) the reprehensibility of the conduct at issue; (2) the disparity between the harm suffered and the award; and (3) the difference between the award and civil penalties authorized or imposed in comparable cases. 538 U.S. at 418. These guideposts are far from specific and exacting; *Campbell*'s analysis confirms as much. Reprehensibility is an inherently qualitative measurement. Moreover, the Supreme Court declined "to identify concrete constitutional limits" and impose "a bright-line ratio which a punitive damages award cannot exceed," but explained that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* at 424–25. It added, however, that "there are no rigid benchmarks," and that the size of the compensatory damage award may affect the constitutionally permissible ratio; again, far from specific or exacting. *Id.*

The shifting standards identified in *Campbell* do not establish a well-defined and dominant public policy marking when punitive damages cross the threshold from constitutionally permissible to so excessive that an arbitration panel exceeds its authority and violates public policy by imposing it. *See* 9 U.S.C. § 10(a)(4). At the very least, UBS failed to carry its "heavy burden" of demonstrating that this case presents such a scenario. *Entergy Operations*, 856 F.3d at 566; *cf. PaineWebber*, 49 F.3d at 351 ("Although it is easy to agree that there is a dominant policy requiring honesty in the securities industry, this policy is not so well-defined as it relates to the panel award at issue."). The Court's review is even more constrained given that the arbitration panel did not engage in any fact-finding. Even so, a 4.8:1 ratio "marks the [Eighth Circuit's] constitutional boundary when multi-million dollar compensatory damages" are awarded. *Ondrisek v. Hoffman*, 698 F.3d 1020, 1030 (8th Cir. 2012); *see also Grant v. Zorn*, 107 F.4th 782, 800 (8th Cir. 2024)

(similar). The punitive damage award, presenting approximately a 3:1 ratio, falls well within this range. [ECF No. 1-14 at 5].

UBS's claim is also qualitatively different from the cases in which the Eighth Circuit has vacated arbitrator awards on public policy grounds. In those cases, the offending award directly contravened a specific regulatory scheme—such as reinstating an employee at a nuclear power plant who violated safety rules enacted "pursuant to a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation." *See, e.g.*, *Iowa Elec.*, 834 F.2d at 1428. Here, by contrast, the panel conducted 39 days of hearings and awarded punitive damages based on substantial evidence of years-long misrepresentations, unsuitable investment advice, improper communications, alteration of business records, deletion of evidence, and a refusal to concede any wrongdoing. The alleged public policy against such an award is far more ambiguous than the one at issue in *Iowa Electric*. *Cf. Meridian Med.*, 158 F.4th at 931–32 (citing cases).

UBS also contends that Claimants improperly relied on the SEC settlement as the primary basis for punitive damages. *See* [ECF No. 1-1 at 17–18]. That argument erroneously invites speculation. The settlement was one component of Claimants' case—they argued that additional deterrence was "warranted" because the prior fine had been "apparently insufficient." [ECF No. 1-3 at 51]. But it was not the only one. Claimants presented substantial independent grounds for punitive damages rooted in a series of deliberate acts targeted specifically at them.

Claimants argued that Burish engaged in improper sales techniques regarding his—and his daughter's—purported short-selling activities, sent hundreds of prohibited communications in blatant defiance of UBS policy, presented Claimants with a grossly unbalanced minority view of the Tesla stock, withheld and omitted critical information, deleted and altered evidence to conceal

his misconduct, and deliberately breached industry standards designed to protect investors. *See* [ECF No. 1-3 at 30, 39, 45]. They contended that UBS failed to supervise him. *Id.* at 45. And they deployed the SEC settlement not only for deterrence but to illustrate the impropriety of Petitioners' "concede nothing" posture—contesting at arbitration the very violations to which they had already admitted before the SEC. *Id.* at 33. Claimants specifically argued that the withholding and omission of critical information, standing alone, was sufficient to warrant punitive damages, and Burish's portrayal of the decline in Tesla stock value was another significant reason.

As a result, Claimants argued Petitioners' "conduct went far beyond mere negligence, and into willfulness with conscious indifference to the consequences—devastating financial harm to their clients." *Id.* at 45. Thus, the SEC settlement was one piece of that case, not the whole of it. Because the parties waived an explained decision, the Court cannot evaluate what weight, if any, the panel afforded to each argument—and that uncertainty forecloses vacatur. "A refusal to enforce an award must rest on more" than the panel's potential consideration of a single factor. *Meridian Med.*, 158 F.4th at 932 (quoting *Misco*, 484 U.S. at 44).

### B. Compliance with Iowa Code § 668A.1

Petitioners also contend that the panel exceeded its authority and violated well-defined Iowa public policy by failing to satisfy the threshold requirements of Iowa Code § 668A.1. [ECF No. 1-1 at 22]. Because the panel neither addressed the allocation of the punitive damage award nor made the requisite factual findings, they argue that the arbitration panel "so imperfectly executed [its powers] that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Court disagrees.

Iowa Code § 668A.1, titled "Punitive or exemplary damages," provides,

1. In a trial of a claim involving the request for punitive or exemplary damages, the court shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings, indicating all of the following:

   a. Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.

   b. Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived.

If subsection (1)(*a*) is satisfied, the factfinder "shall fix the amount" of punitive damages to be awarded pursuant to an additional finding under subsection (1)(*b*). Iowa Code § 668A.1(2). If subsection (1)(*b*) is also satisfied, the plaintiff is awarded the full amount of punitive damages. *Id.* § 668A.1(2)(*a*). If subsection (1)(*b*) is not satisfied, the plaintiff receives up to 25% of the award, with the remainder paid into a civil reparations trust fund administered by the State. *Id.* § 668A.1(2)(*b*).

By its terms, Section 668A.1 is tailored to punitive damage awards in a judicial setting. It presupposes a "trial," a "jury," and a "court"—none of which is present in arbitration. *Id.* § 668A.1(1). Other procedural aspects confirm the same. *See, e.g.*, *id.* (requiring the jury to answer by a special interrogatory); *id.* § 668A.1(3) (governing the scope of discovery when punitive damages are sought).

Additionally, although Petitioners frame their argument as a public policy challenge, they functionally present a claim that the panel disregarded the law. Petitioners acknowledge that the "panel relied on Iowa Code § 668A.1 as authority for the punitive award." [ECF No. 1-1 at 22]. But they contend that the panel failed to satisfy Section 668A.1's requirements. *Id.* Put differently, the panel recognized Section 668A.1, but chose not to follow it—a manifest disregard argument that has been foreclosed by the Supreme Court as a basis for vacatur or modification. *See Hall*

*Street*, 552 U.S. at 583–84; *Beumer Corp. v. ProEnergy Servs., LLC*, 899 F.3d 564, 566 (8th Cir. 2018).

Even setting aside those threshold issues, the public policy argument fails on the merits. Petitioners claim that "Section 668A.1(b) demonstrates Iowa's well-defined public policy of denying claimants an undue windfall" because it establishes a default rule mandating "that the great majority of any punitive damages provide funding for a civil reparations fund." [ECF No. 1-1 at 23]. True, the statute envisions scenarios under which most of the punitive damages award is directed to a civil reparations fund. Iowa Code § 668A.1(2)(*b*). But the same statute also explicitly contemplates scenarios in which claimants receive the entire award. *Id.* § 668A.1(2)(*a*). As such, Petitioners' undue windfall public policy argument cannot be squared with a statute that, depending on the circumstances, awards claimants everything. Moreover, the panel's bare citation to Section 668A.1 does not reveal the purpose for which it was invoked.

Petitioners' remaining contention rests on speculation. They argue the panel erred because it did not make specific findings regarding whether Petitioners' conduct "constituted willful and wanton disregard for the rights or safety of another" and whether "the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim derived." [ECF No. 1-1 at 22, 23] (quoting Iowa Code § 668A.1(1)). But the absence of such findings was a consequence of the parties' own bargain. Petitioners knew that Claimants relied on Section 668A.1 in seeking punitive damages. *See, e.g.*, [ECF No. 1-3 at 45]. Despite this knowledge, Petitioners never asked the panel to make factual findings or explain its decision. They cannot now complain about the informality they accepted, and the Court cannot be certain what the arbitration panel did or did not conclude.

Arbitration does not provide the same procedural formality as the judicial process; that is a feature, not a bug. The parties did not request a reasoned decision from the panel pursuant to FINRA Rule 12904(g)(1). Petitioners cannot now use the absence of an explained decision as a sword to vacate the panel's award. *See Interactive Brokers LLC v. Saroop*, 969 F.3d 438, 441 (4th Cir. 2020) ("The lack of explanation is consistent with the fact that no party requested a reasoned decision, and so the arbitrators were under no obligation to provide the rationale for the award."). Even if Iowa Code § 668A.1 imposes substantive requirements, those apply to a judicial setting, not arbitration where informality is a key benefit. *See Harlan Feeders, Inc. v. Grand Lab'ys, Inc.*, 881 F. Supp. 1400, 1408 (N.D. Iowa 1995).

Petitioners resist this conclusion, arguing that the arbitration agreement required the panel to conduct proceedings in accordance with "applicable law," here, Iowa Code § 668A.1. [ECF No. 1-1 at 24]. However, without an explained decision—as agreed by the parties—the Court cannot conclude that the panel did not follow the applicable law. Section 668A.1 expressly permits claimants to recover 100% of a punitive damages award in certain circumstances. The panel could have concluded the requisite conditions were satisfied here. As one court put it, "[t]he absence of any evidence of the Panel's decision-making process leaves nothing for this Court to do but speculate as to what the Panel may have been thinking when they made their decision, a policy clearly contrary to the interests of justice." *Fitzgerald v. H&R Block Fin. Advisors, Inc.*, Civil No. 08-10784, 2008 WL 2397636, at *4 (E.D. Mich. June 11, 2008).

The record also supplies practical inferences that Petitioners overlook. The panel cited *McGough* in support of the punitive damages award. [ECF No. 1-14 at 5]. The cited passage defines Iowa's legal standard for willful and wanton conduct in the context of punitive damages. *See McGough*, 526 N.W.2d at 334 (quoting *Fell v. Kewanee Farm Equip Co.*, 457 N.W.2d 911,

919 (Iowa 1990)). This creates a strong inference that the panel concluded that Petitioners' conduct was willful and wanton, as required under Iowa Code § 668A.1(1)(*a*).

The claims pursued by Claimants point in the same direction on the directed-conduct question under the statute. *See* Iowa Code § 668A.1(1)(*b*). Claimants alleged that Petitioners "breached their fiduciary duties to Claimants" in several ways; "breached their obligations to Claimants under FINRA's suitability rules;" caused Claimants' losses through negligent supervision; and "intended to deceive Claimants" by making "misrepresentations and omissions" that "caused Claimants' losses." [ECF No. 1-2 ¶¶ 67, 76, 77, 86, 96]. Claimants alleged that each of these actions were "wanton and willful" thus "justifying the imposition of punitive damages." *Id.* ¶¶ 73, 79, 87, 97. The panel's imposition of liability on those claims creates a reasonable inference that it determined Petitioners' conduct was directed specifically at Claimants thus entitling them to the full award under Section 668A.1(2)(*a*).

Petitioners' citation to *Brown v. Brown-Thill*, 762 F.3d 814 (8th Cir. 2014), does not compel a different outcome. *See* [ECF No. 1-1 at 23]. In that case, the Eighth Circuit concluded that the arbitrator "exceeded his powers by exercising the exclusively judicial function of removing" an individual as trustee "on statutory grounds"—because the award rested on a statutory removal mechanism rather than the arbitrator's interpretation of the contractual removal provision. *Brown-Thill*, 762 F.3d at 824–25. That is a materially different situation. Here, the panel was "arguably construing or applying" the contractual requirement to apply "applicable law"— precisely the standard under which courts must leave an award undisturbed. *Id.* at 824 (quoting *Sutter*, 569 U.S. at 568).

FINRA guidance encourages arbitrators to "include in the award the basis for awarding punitive damages." [ECF No. 1-12 at 70]. The fact that the guidance uses "should" demonstrates

that it is not a requirement, nor does it displace the rules permitting parties to forgo a reasoned decision.  If Petitioners wished to receive an explanation of the panel's award, they should have moved for such an explanation under FINRA rules.

Nonetheless, the Court is not blind to the size of the award.  But the Eighth Circuit cases Petitioners cite reducing punitive damages arose in an entirely different legal posture.  For example, in *Conseco Finance Servicing Corp. v. North American Mortgage Co.*, the Eighth Circuit reduced a jury's $18 million punitive damages award—a 5.14:1 ratio to compensatory damages— to $7 million to "comport with the requirements of the Due Process Clause."  381 F.3d 811, 823– 25 (8th Cir. 2004).  Similarly, in *Ondrisek v. Hoffman*, the Eighth Circuit reduced a $60 million punitive damages award—a 10:1 ratio to the $6 million compensatory damages—down to $24 million, again on due process grounds.  698 F.3d at 1031; *see also id.*  (collecting cases).

This case presents critical differences; no jury rendered a verdict, the Court is not the source of the award, and Petitioners expressly disavow any due process claim.  Petitioners do not identify any Eighth Circuit case where a court vacated or modified an arbitration panel's award of punitive damages as a violation of public policy under 9 U.S.C. § 10(a)(4).

Petitioners have failed to demonstrate that the arbitration panel exceeded its authority or so imperfectly executed its powers as to act contrary to public policy.  9 U.S.C. § 10(a)(4).  They do not identify any basis under 9 U.S.C. § 11 to modify the punitive damages award.  *Cf. Stark*, 381 F.3d at 799 n.2.  In the absence of any statutory authority to modify or vacate, the Court must confirm the award.  9 U.S.C. § 9.

### C.  Attorney's Fees and Interest

Finally, Claimants seek attorney's fees, costs, and post-judgment interest.  [ECF No. 25 ¶¶ 21, 22].  They claim that costs and fees are warranted because Petitioners could have raised

their objections to the punitive damage award and compliance with Iowa Code § 668A.1(1)(*b*) before the arbitration panel, but failed to do so. *Id.*

"[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Schlafly v. Eagle Forum*, 970 F.3d 924, 937 (8th Cir. 2020) (citation omitted). This is a high burden, one that Claimants have not met. The Court agrees that "[a]n unjustified refusal to abide by an arbitrator's award may constitute bad faith," but that is not what this case presents. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. United Farm Tools, Inc.*, 762 F.2d 76, 77 (8th Cir. 1985) (per curiam). Petitioners' arguments are novel, not frivolous, and their challenge does not demonstrate an outright defiance that bad faith requires.

Nonetheless, post-judgment interest is appropriate. FINRA Rule 12904(j) provides that an arbitration award "shall bear interest from the date of the award . . . at the legal rate" in Iowa, a rate equal to the one-year treasury constant maturity from the H15 report "settled immediately prior to the date of the judgment plus two percent." Iowa Code § 668.13(3). Here, the applicable H15 report reflects a rate of 4.13%. [ECF No. 24-2]. This yields a post-judgment interest rate of 6.13%—the figure Claimants request—running from February 28, 2025. Iowa Code § 668.13(3).

## IV.    CONCLUSION

Arbitration "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 479 (1989). It "is designed primarily to avoid the complex, time-consuming and costly alternative of litigation." *Stark*, 381 F.3d at 803 (citation omitted). Permitting courts to "second guess" an arbitration panel's award would defeat those very advantages. *$99 Down Payment, Inc. v. Garard*, 592 N.W.2d 691, 694 (Iowa 1999);

*PaineWebber Inc. v. Farnam*, 843 F.2d 1050, 1052–53 (7th Cir. 1988) ("Arbitration is neither quick nor cheap when one party litigates to the gills").

The parties arbitrated their dispute pursuant to the UBS Client Relationship Agreement. They did not jointly request an explained decision, and Petitioners did not raise many of their arguments to the panel. Petitioners were well-versed in the consequences of those choices and cannot now disavow them. *See Stark*, 381 F.3d at 803. "The parties bargained for the arbitrator's decision; if the arbitrator got it wrong, then that was part of the bargain." *ProEnergy Servs.*, 899 F.3d at 566.

UBS has failed to carry its "heavy burden" of demonstrating that the panel exceeded its authority by imposing a grossly excessive punitive damage award in violation of public policy. *Entergy Operations*, 856 F.3d at 566. Likewise, Petitioners' Iowa Code § 668A.1 arguments fail. *See* 9 U.S.C. § 10(a)(4). And because they fail to articulate any argument to modify the award under 9 U.S.C. § 11 beyond their cursory reference to the statute, modification is not appropriate. As such, Petitioners' motion to vacate the arbitration award is DENIED. [ECF No. 1]. Claimants' motion to confirm the arbitration award is GRANTED in part. [ECF No. 25]. Claimants are awarded post-judgment interest at a rate of 6.13% beginning on February 28, 2025, but are not entitled to recover attorney's fees and costs.

IT IS SO ORDERED.

Dated this 30th day of April, 2026.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT